UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
LYNX TECHNOLOGY PARTNERS, INC.,              :
                                             :
                              Plaintiff,     :
                                             :        MEMORANDUM & ORDER
             -against-                       :
                                             :        18-cv-3881 (ENV) (PK)
PITTS MANAGEMENT ASSOCIATES, INC.            :
                                             :
                              Defendant.     :
------------------------------------------------------------- x

VITALIANO, D.J.

On July 5, 2018, Lynx Technology Partners, Inc. ("Lynx") filed this action against Pitts

Management Associates, Inc. ("PMA"), bringing breach of contract, account stated and

indemnification claims. The parties have cross-moved for summary judgment pursuant to

Federal Rule of Civil Procedure 56(a). For the reasons set forth below, both motions are granted

in part and denied in part.

<u>Background</u>[1]

In December 2013, the State University of New York – Downstate Medical Center

("SUNY Downstate"), a Brooklyn-based academic medical center, contracted with PMA, a

Louisiana-based healthcare consulting company, to carry out an organization-wide restructuring

project, which was apparently spurred by financial difficulties at the hospital. *See* Pl.'s 56.1

Reply, Dkt. 38-1, ¶ 1; Perminter Opp'n Decl., Dkt. 38-2, ¶ 3; SUNY-PMA Contract, Dkt. 38-3;

Murray Tr., Dkt. 37-11, at 31:14–23. Under the contract, PMA had to comply with SUNY's

---

[1] The relevant facts are drawn from the complaint, the parties' Local Rule 56.1 statements and
their submissions on the motions for summary judgment, and are reviewed in the light most
favorable to the nonmoving parties. *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*,
473 F.3d 450, 456 (2d Cir. 2007). Any factual disputes are noted.

affirmative action requirements, which obligated PMA to allocate a portion of the work to minority- and women-owned business enterprises.  Perminter Opp'n Decl. ¶¶ 4–5; SUNY-PMA Contract at 19–21; Murray Tr. at 46:10–23, 49:4–14.  Lynx is a minority-owned business enterprise and PMA is not.  Lynx had responded to SUNY Downstate's request for proposals on the restructuring project, but did not get the job.  Elcock Tr., Dkt. 37-9, at 17:2–7, 31:19–32:2.  PMA selected Lynx as a subcontractor on the project, however, and the companies entered into a contract in November 2013.  Pl.'s 56.1 Reply ¶ 3; Lanius Tr., Dkt. 37-10, at 27:14–28:8; Revised PMA-Lynx Agreement, Dkt. 38-5.

To carry out the work, PMA recommended that Lynx hire as subcontractors the companies Expeditive and Nearterm, with whom PMA had worked previously on related projects, given their greater expertise in the project's tasks.  *See* Murray Tr. at 40:9–18, 43:11–44:4; Mahin Tr. at 109:21–110:14.  Lynx entered into subcontracts with both entities, who then supplied individual consultants.  *See* Lynx-Nearterm Contract, Dkt. 38-6; Lynx-Expeditive Contract, Dkt. 38-7.  The project was broken down into various focus areas—such as the "revenue cycle" by which SUNY Downstate would bill and receive payment from insurers—with each governed by a work order agreement ("WOA").  *See* Pl.'s 56.1 Reply ¶¶ 6–8; Elcock Tr. at 17:12–18:22.  To request payment, Lynx would invoice PMA for consulting fees and expenses, sending invoices electronically from Lynx's email to PMA's.  Mahin Tr. at 48:7–49:9, 52:1–7.  It was not to be a short-term relationship; the restructuring project lasted two years, concluding in December 2015.  Lanius Tr. at 18:21–19:8, 25:10–16.  PMA ceased operations not long after, when its founder retired.  *See id*. at 14:10–20; Murray Tr. at 21:2–18.

During and after the two-year project, disputes over payment arose at every level.  The state audited PMA given concerns over improper expense reimbursements, such as a hotel room

that cost over $1,000 per night.  *See* Perminter Opp'n Decl. ¶ 24; Dkt. 38-13 at 6.  PMA sued

SUNY Downstate for around $875,000 in unpaid expense invoices.  *See* Dkt. 38-14; Murray Tr.

at 68:6–69:7.  Both Expeditive and Nearterm sued Lynx over unpaid invoices.  *See* Pl.'s 56.1

Reply ¶¶ 21–37.  Hounded by the subcontractors' suits and given the failure of its prior efforts to

agree with PMA on the amount of remaining unpaid invoices, Lynx filed the instant action.  *See*

*id.* ¶ 37; Edgens Aff., Dkt. 37-29, ¶¶ 17–21; Compl., Dkt. 1.  It initially sought to recover about

$416,000 in unpaid consultants' fees and expenses, though its subsequent withdrawal of various

claims has lowered that sum to around $175,000.[2]

Discussion

I.    <u>Choice of Law</u>

     In preface to their larger battle, the parties dispute which state's law governs this action.

PMA argues for the application of Louisiana law in accordance with the choice-of-law clause in

the parties' contract, while Lynx argues that New York has the most significant interest in the

dispute and its law should govern.  The question presented is hardly novel.  A federal court

sitting in diversity will, ordinarily, apply the rule of its forum state to determine the choice of

law.  *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 822 F.3d 620, 641 (2d Cir.

2016).  Following that rule of decision, where, as here, a contract between the parties contains an

express choice-of-law provision, New York law determines that provision's validity and scope.

---

[2] The parties have acknowledged that certain individual claims ought to be withdrawn,
apparently giving greater scrutiny to records essential to motion practice regarding those claims.
*See* Pl.'s Opp'n Mem., Dkt. 38, at 11 n.6 (withdrawing quantum meruit claim), 13 n.7 (invoices
15-1338 and 15-1339), 15 n.8 (indemnification claim as to the Expeditive litigation), 19 & n.10
(invoices 14-4102, 14-4106, 14-4206, 14-4209 and 14-3105), 22 n.11 (invoices 14-1364, 14-
1365, 14-1367 and 14-1368); Pl.'s 56.1 Reply ¶¶ 87–106 (invoices 14-2466, 14-2467, 14-3794,
14-3902, 14-3994 and 15-1340).  In that spirit, and as discussed below, PMA has conceded
liability on some expense invoices.  *See* Def.'s Opp'n Mem., Dkt. 43, at 7–8.

*See Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 333 (2d Cir. 2005). As to its validity, "New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or a violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000); *see also Bank of New York v. Yugoimport*, 745 F.3d 599, 609 (2d Cir. 2014). This rule reflects New York's recognition that "[a] basic precept of contract interpretation is that agreements should be construed to effectuate the parties' intent," so "[w]here an agreement is clear and unambiguous, a court is not free to alter it and impose its personal notions of fairness." *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624, 629, 825 N.Y.S.2d 692, 859 N.E.2d 498 (2006).

Facts background to contract formation, moreover, are essentially undisputed. For example, there is no question that the contract between the parties provides that "[t]he laws of the State of Louisiana, with venue in East Baton Rouge Parish, shall govern this Agreement." Revised PMA-Lynx Agreement ¶ 23. Nor that PMA is incorporated in Louisiana and had its principal place of business in Baton Rouge, Louisiana. Pl.'s 56.1 Reply ¶¶ 1, 13. PMA's Chief Financial Officer, Robin Edgens, the contractually designated point-person overseeing payments to Lynx, worked at the Baton Rouge headquarters, as did the employee who helped her manage accounts payable and Executive Vice President and Chief Operating Officer Kimberly Murray, who signed the contract. *See id.*; Edgens Aff. ¶¶ 2–8; Revised PMA-Lynx Agreement ¶¶ 3, 17. As a matter of law, a party has sufficient contacts to support a contractual choice-of-law provision in the state where it maintains its principal place of business. *See Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 366 (2d Cir. 2003); *Finucane v. Interior Const. Corp.*, 264 A.D.2d 618, 620, 695 N.Y.S.2d 322 (1st Dep't 1999).

Even though these facts could under New York law justify the application of Louisiana law in this case, Lynx contends that public policy nonetheless requires the application of New York law, pointing to New York's higher prejudgment interest rate and arguing that the state has an interest in ensuring PMA fully compensates the subcontractor picked in accordance with SUNY Downstate's affirmative action requirements. *See* Pl.'s Opp'n Mem., Dkt. 38, at 8–9; Pl.'s Reply, Dkt. 42, at 3. New York courts, however, "have reserved the public policy exception 'for those foreign laws that are truly obnoxious.'" *Welsbach Elec. Corp.*, 7 N.Y.3d at 629 (quoting *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 79, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993)). This places a "heavy burden" on the party invoking the exception. *Id.* at 632. Lynx has failed to meet this burden. First off, breach of contract claims in New York and Louisiana require plaintiffs to establish essentially the same elements.[3] *Cf. 2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 209 (S.D.N.Y. 2015) (finding that applying another state's substantially similar breach of contract law was not "truly obnoxious" or against public policy). The prospect of greater recovery under New York law is not sufficient, nor are Lynx's "individual notions of expediency and fairness." *Cooney*, 81 N.Y.2d at 79–80 (internal citation and quotation marks omitted). In fact, New York law routinely requires the application of other states' lower prejudgment interest rates, because "under New York choice of law principles, the allowance of prejudgment interest is controlled

---

[3] To recover on a breach of contract claim under New York law, the plaintiff must establish "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). Similarly, the elements of such a claim under Louisiana law are "(1) the obligor undertook an obligation to perform, (2) 'the obligor failed to perform the obligation,' and (3) 'the failure to perform resulted in damages to the obligee.'" *Helpful Hound, L.L.C. v. New Orleans Bldg. Corp.*, 331 F. Supp. 3d 581, 602 (E.D. La. 2018) (quoting *Favrot v. Favrot*, 68 So. 3d 1099, 1109 (La. Ct. App. 2011)).

by the law of [the state] whose law determined liability on the main claim." *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 147 (2d Cir. 2008) (awarding interest at California rate); *see also, e.g.*, *U.S. Bank Nat'l Ass'n v. Brooklyn Motor Cars, Inc.*, No. 18-CV-2609 (CBA) (PK), 2019 WL 1370696, at *5 (E.D.N.Y. Mar. 4, 2019) (applying Ohio prejudgment interest rates of 4% and 5% per contractual choice-of-law clause); *Imperium Ins. Co. v. Am. W. Home Ins. Co.*, No. 15-CV-5471 (SJF) (SIL), 2018 WL 5298430, at *17 & n.5 (E.D.N.Y. Aug. 8, 2018) (applying New Jersey's 2.5% pre-judgment interest rate); *Fin. Cas. & Sur. Co., Inc. v. Zouvelos*, No. 12-CV-3476 (AMD) (RLM), 2018 WL 3950634, at *4 (E.D.N.Y. May 3, 2018) (applying Texas's 5% rate). Louisiana's lower pre-judgment interest rate, which ranged from 4% to 6% during the relevant time period, is not "truly obnoxious" so as to void the parties' choice-of-law provision. *See Judicial Interest Rates*, La. Off. Fin. Inst., http://www.ofi.state.la.us/Legal%20Judicial%20Rate.htm. Moreover, the parties are "both sophisticated commercial entities that knowingly and voluntarily entered into the subcontract." *Welsbach Elec. Corp.*, 7 N.Y.3d at 632. The Court, therefore, finds the contract's Louisiana choice-of-law provision valid and enforceable.[4]

The next task, then, is to determine its scope. At a minimum, Louisiana law applies to Lynx's breach of contract and indemnification claims, which arise directly from the parties' agreement. Conversely, choice-of-law clauses typically do not extend to extra-contractual causes of action, and "New York courts are 'reluctan[t] to read choice-of-law clauses broadly.'"

---

[4] The Court also rejects Lynx's argument that PMA's consent to venue in this district constituted a waiver of the choice-of-law provision, contained in the same paragraph. *See* Pl.'s Opp'n Mem. at 7–8; Revised PMA-Lynx Agreement ¶ 23. The contract specifies that a waiver of one right does not affect another, and PMA has consistently argued for the application of Louisiana law. *See* Revised PMA-Lynx Agreement ¶ 21; *Steptore v. Masco Const. Co.*, 643 So. 2d 1213, 1216 (La. Ct. App. 1994) (waiver requires "intentional relinquishment of a known right").

*Arnone v. Aetna Life Ins. Co.*, 860 F.3d 97, 108 (2d Cir. 2017) (quoting *Fin. One Pub. Co.*, 414 F.3d at 335). Where a choice-of-law provision states simply that "[t]his Agreement will be governed by" a state's laws, it governs only contractual claims, and the court must undertake a choice-of-law analysis to determine which state's law governs other claims. *Fin. One Pub. Co.*, 414 F.3d at 335. If, on the other hand, the clause uses broad language covering "any claim arising from the [parties'] relationship," it sweeps in extra-contractual claims. *McPhee v. Gen. Elec. Int'l, Inc.*, 736 F. Supp. 2d 676, 681–82 (S.D.N.Y. 2010), *aff'd*, 426 F. App'x 33 (2d Cir. 2011). As a result, different states' laws can apply to different claims in a single action. *See 2002 Lawrence R. Buchalter Alaska Tr.*, 96 F. Supp. 3d at 200.

Drilling down on the assortment of claims advanced, Lynx's third claim is for account stated. This claim is equitable in nature. *See Samara v. Gangemi & Gangemi*, No. 02-CV-1407 (RML), 2005 WL 1076320, at *3 (E.D.N.Y. May 3, 2005). Accordingly, it falls outside the scope of the contractual choice-of-law provision, which provides only that Louisiana law "shall govern this Agreement." Revised PMA-Lynx Agreement ¶ 23. *Cf., e.g.*, *Gross Found., Inc. v. Goldner*, No. 12-CV-1496 (ILG), 2012 WL 6021441, at *11 (E.D.N.Y. Dec. 4, 2012); *Icebox-Scoops v. Finanz St. Honore, B.V.*, 676 F. Supp. 2d 100, 114 (E.D.N.Y. 2009). With a choice of law determination, therefore, compelled, the first question is whether there is an actual conflict between relevant New York and Louisiana law. *See Fieger*, 251 F.3d at 393. An actual conflict need not be "outcome determinative," but exists where "the applicable law from each jurisdiction provides different substantive rules" with a "significant *possible* effect on the outcome of the trial." *Fin. One Pub. Co.*, 414 F.3d at 331 (internal citations and quotation marks omitted). If there is no conflict, New York law applies. *See Wall v. CSX Transp., Inc.*, 471 F.3d 410, 422 (2d Cir. 2006). If there is a conflict, a traditional choice-of-law analysis must be undertaken, asking

which state has the greatest interest in and most contacts with the dispute. *See Fireman's Fund Ins. Co.*, 822 F.3d at 641; *Fieger*, 251 F.3d at 394.

Under New York law, a claim for account stated requires the plaintiff to establish that "(1) an account was presented; (2) it was accepted as correct; and (3) debtor promised to pay the amount stated." *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009). The second and third elements "may be implied if 'a party receiving a statement of account keeps it without objecting to it within a reasonable time or if the debtor makes partial payments.'" *Id.* Louisiana courts recognize a similar claim, but have "applied [it] sparingly" and cast doubt on its "precedential value" under that state's distinct legal system. *Conmaco/Rector L.P. v. L & A Contracting Co.*, No. 12-CV-2337 (JTM), 2014 WL 1796651, at *8 (E.D. La. May 6, 2014). Additionally, Louisiana law provides for a cause of action on an "open account," available to claimants 30 days after sending a written demand for the correct amount owed. *See* La. Stat. Ann. § 9:2781; *Phoenix Int'l Holdings, Inc. v. UH Servs. Grp., LLC*, No. 20-CV-1684 (GGG), 2020 WL 5749517, at *3 (E.D. La. Sept. 25, 2020). Given Louisiana's apparent disfavor of account stated claims and differing statutory scheme for claims on an "open account," the Court finds there is an actual conflict, requiring a choice-of-law analysis.

As previewed, this analysis turns on which state has the "most significant relationship" to the dispute. *See Fieger*, 251 F.3d at 394. That state is clearly New York. SUNY Downstate, in Brooklyn, is the place of the project's performance and subject matter. *See* SUNY-PMA Contract at 1; Perminter Opp'n Decl. ¶ 14. Lynx was incorporated in and, arguably, had its principal place of business in New York at the relevant time. Perminter Opp'n Decl. ¶¶ 15–16. The contracts between SUNY and PMA and between Lynx and its subcontractors are all governed by New York law. *See* SUNY-PMA Contract at 12; Lynx-Nearterm Contract at 10;

Lynx-Expeditive Contract at 8. Therefore, while PMA's contacts with the project predominantly occurred from its Louisiana base, the center of gravity was in New York, and New York's law should, and will be, applied to the account stated claim.[5] In short, a split verdict, since this analysis does not upset the finding that Louisiana law applies to the main contract claims.

II.   Breach of Contract

The liberality of pleading rules lends the pleader its usual forgiving backdrop. Plaintiff, as is its right, has pleaded its claim for damages under separate theories. The pleading of multiple theories is permitted; the recovery of multiple awards for the same damages is not. Since all claims arise out of the contractual relationship between the parties, analysis will begin with the breach of contract claims. To prevail on a breach of contract claim under Louisiana law, Lynx "must establish that (1) the obligor undertook an obligation to perform, (2) 'the obligor failed to perform the obligation,' and (3) 'the failure to perform resulted in damages to the obligee.'" *Helpful Hound, L.L.C. v. New Orleans Bldg. Corp.*, 331 F. Supp. 3d 581, 602 (E.D. La. 2018) (quoting *Favrot v. Favrot*, 68 So. 3d 1099, 1109 (La. Ct. App. 2011)).

_____

[5] The procedural law of the forum state also applies to process issues, such as the assertion of a statute of limitations affirmative defense. *See 2002 Lawrence R. Buchalter Alaska Tr.*, 96 F. Supp. 3d at 200, 202 n.8. Although the parties discuss, in depth, the applicability and effect of New York's borrowing statute, C.P.L.R. § 202, the Court finds is this a moot point as it does not grant Lynx recovery on any claims that accrued outside a potentially applicable statute of limitations, making it unnecessary to decide which statute of limitations does actually apply— New York's (six years on breach of contract and account stated claims, the state of Lynx's incorporation and a potential principal place of business), Pennsylvania's (four years on both, also a claimed principal place of business) or New Jersey's (six years on both, another alleged principal place of business). *See* N.Y. C.P.L.R. § 213(2); *Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff*, 638 F. Supp. 714, 722 (S.D.N.Y. 1986); N.J. Stat. Ann. § 2A:14-1; *Loeffler Thomas P.C. v. Fishman*, No. 15-CV-5194 (RBS), 2016 WL 1457895, at *7 (E.D. Pa. Apr. 12, 2016); Pa. Consol. Stat. § 5525(a). As Lynx is not a Louisiana resident, the claims did not accrue there and Louisiana's limitations periods do not apply. *See 2002 Lawrence R. Buchalter Alaska Tr.*, 96 F. Supp. 3d at 201 (claims involving economic harm accrue at plaintiff's place of residence).

On that analytical framework, there is no dispute that Lynx and PMA entered into a valid contract, satisfying the first element. *See* Pl.'s 56.1 Reply ¶ 3. The dispute is over whether PMA, the obligor, failed to perform its duty to pay any of the disputed invoices, resulting in damages to Lynx as the obligee. The disputed invoices will be broken down by category, but the following sections of the parties' contract are generally applicable:

> 3. PAYMENT. PMA shall pay Lynx Technology Partners, Inc. for the Services as set forth in Exhibit B, attached hereto and made a part hereof. The fees shall be invoiced to PMA on a monthly basis unless otherwise agreed to by the parties and shall be payable within sixty days of receipt of invoice unless otherwise specified. . . . Staff Members must complete detailed time reports for engagement management purposes on a weekly schedule to the PMA Accounting Department in a format approved by PMA. PMA's CFO is the point person for the Staff Members in these matters.
>
> 4. EXPENSE REIMBURSEMENT. PMA shall reimburse Lynx Technology Partners, Inc. for all "out-of-pocket" travel and living expenses and for all other pre-approved "out-of-pocket" expenses if they are not part of the project fee, in accordance with PMA policies and procedures. Lynx Technology Partners, Inc. Staff Members will follow PMA policies on completing expense reports in a timely (weekly) manner, and providing original receipts and documentation. The expense reimbursement shall be within sixty days of receipt of expense reports, providing these are in an approved format with the appropriate documentation or according to the Work Order, whichever is sooner.

Revised PMA-Lynx Agreement ¶¶ 3–4.

Exhibit B provides that the work orders shall set forth the fee and expense payment terms for their respective projects. *Id.* at Ex. B. The agreement also includes a work order template. *Id.* at Ex. A-1.

###### A.     *Disputed Invoices under LTP003*

i.    Invoice 14-893R

First, the parties cross-move for summary judgment on the largest disputed invoice, invoice 14-893R, which requested $40,000 as the third installment of fees due under WOA LTP003. *See* Def.'s Mem., Dkt. 37-1, at 27–31; Pl.'s Mem., Dkt. 40-1, at 12. Lynx argues that

PMA breached the contract by not paying this installment, while PMA counters that the WOA was modified to permit weekly invoices, which it paid.

This WOA, entered into on March 11, 2014, concerned efforts to improve the ways in which SUNY Downstate's medical records reflected the services provided to patients, so that the hospital could more accurately bill insurers for those services. *See* Pl.'s 56.1 Reply ¶ 108; Lanius Tr. at 41:23–43:3; Elcock Tr. at Ex. 4. Specifically, the WOA called for consultant Elizabeth Rehmann to assess the Health Information Management ("HIM") Department, then write and present a report summarizing her recommendations within 30 days. *See* Elcock Tr. at 62:4–64:3, Ex. 4. If her recommendations were approved, the last task was to "prepare work plan and begin implementation," though the agreement also said the consultant's role was to "implement process improvement changes in HIM department." *Id.* at Ex. 4. The project was slated to begin in March 2014 and run 24 weeks, so through August—though the WOA elsewhere provides a 13-week estimated timeframe—with the option to extend it at SUNY Downstate's request. *Id.* The WOA stated that the consultant's rate was $125 per hour (capped at 40 hours per week), the equivalent of a rate of $5,000 weekly and $20,000 monthly. *Id.* Then, on the following page, it further provided that "for budgeting purposes only," without "bind[ing] the client to any set hours or dollars for this WOA," the estimated length is 13 weeks and value was $120,000, with $40,000 due upon execution of the WOA, $40,00 due 45 days in, and $40,000 due on project completion. *Id.*

PMA paid Lynx's invoice for the first $40,000 installment on March 18, 2014, the day before Rehmann began work. *See* Pl.'s 56.1 Reply ¶¶ 109, 125; Dkt. 37-70. Over the following month, Rehmann wrote and submitted her report on the HIM Department. *See* Pl.'s 56.1 Reply ¶¶ 113–14; Lanius Tr. at 50:21–51:3, Ex. 5. Her contract, however, only ran through late April,

after which she requested a higher fee to continue. Pl.'s 56.1 Reply ¶ 112; Elcock Tr. at 109:18–110:7; Lanius Tr. at Ex. 5. PMA and Lynx rejected the request, so Rehmann left after finishing her report. *See* Pl.'s 56.1 Reply ¶¶ 112–13; Elcock Tr. at 110:8–23; Lanius Tr. at 46:17–24. In early May, Lynx replaced Rehmann with consultant Addie Price, from subcontractor Nearterm, who worked on implementing the report. Pl.'s 56.1 Reply ¶¶ 113, 116–17; Elcock Tr. at 105:7–15.

Meanwhile, Lynx continued to catch up on its invoicing. On April 18, 2014, Lynx sent PMA an invoice including Rehmann's fees for her first nine days on the job, but submitted a revised version without those fees on May 11, recognizing that "[o]ur agreement was to invoice Pitts in three installments; therefore, no professional services fees should have been included." Dkts. 37-80, 37-81. That same day, Lynx submitted an invoice for the second $40,000 installment under LTP003. *See* Pl.'s 56.1 Reply ¶ 111; Dkt. 37-71. Price appears to have begun work the next day, May 12. *See* Dkt. 37-72 at 3. On June 30, PMA paid Lynx's invoice for the second installment. *See* Dkt. 37-71.

The record shows that Lynx next sought payment under LTP003 in July 2014. Lynx's invoice 14-893R, requesting the third $40,000 installment payment, is dated July 15, though PMA disputes receiving it on that date or any other. *See* Pl.'s 56.1 Reply ¶ 120; Edgens Aff. ¶ 101; *see also* Dkt. 37-69 (containing invoice but no transmission email); Dkt. 42-3 at 3 (Lynx, in its interrogatories, dating the invoice "9/11/2014"). On July 18, Lynx submitted an invoice dated May 24, requesting $8,000 in fees for Price's first eight days of work on LTP003. Dkt. 37-72. PMA has not paid the invoice for the third installment. *See* Pl.'s 56.1, Dkt. 40-2, ¶ 5. It did, however, pay the invoice for Price's fees on July 31. Edgens Aff. ¶ 109; Dkt. 37-72. Lynx continued this periodic invoicing, submitting 14 invoices totaling $120,125 for Price's fees under

LTP003, bringing PMA's payments under that WOA to $200,125.  Edgens Aff. ¶¶ 105–06, 109–
16.[6]

On November 24, 2014, Lynx and PMA entered into WOA LTP008, which called for
Price to continue her work implementing Rehmann's recommendations, as well as hiring and
training HIM Department staff.  *See* Pl.'s 56.1 Reply ¶ 135; Elcock Tr. at Ex. 1.  The LTP008
project would begin on December 3, 2014 and run 26 weeks, with Price billing 40 hours per
week at an increased hourly rate of $144.  Elcock Tr. at Ex. 1.  The payment terms called for
monthly invoicing based on hours worked.  *Id.*  Lynx made no further request for a third
installment payment under LTP003 until after January 2018, when it audited its accounts and
determined invoice 14-893R was outstanding.  *See* Mahin Tr. at 55:1–57:14, 74:11–75:9, 199:7–
19.  This claim followed.

At the core of the dispute lies the parties' divergent interpretations of LTP003.  PMA
argues that the $120,000 value was always an estimate based on the consultant's $5,000 weekly
rate over the project's 24-week duration, and that PMA was obligated to pay only the hours
Lynx's consultant actually worked—whether those were more or less than anticipated.
Accordingly, it argues that the final $40,000 payment would always have been subject to change
based on the project's duration.  Further, PMA argues that the parties, by their conduct, modified
the contract in summer 2014 to permit Lynx to invoice for Price's fees periodically.  This
arrangement benefitted Lynx, PMA says, by allowing it to receive payment, and thus pay its

---

[6] These 14 invoices for Price's work under LTP003 are: 14-1028, 14-1053, 14-1054, 14-1055,
14-1056, 14-1057, 14-1120, 14-1200, 14-1361, 14-1362, 14-2038, 14-2112, 14-2314 and 14-
2308.  *See* Edgens Aff. ¶¶ 109–16.  As discussed below, PMA would later calculate that it had
overpaid the work order by around $45,000 and offset this sum against Lynx's later invoices for
Price's fees, *see* Dkt. 37-82, but even subtracting that sum leaves Lynx with higher earnings
under LTP003 than the anticipated $120,000.

subcontractors, more frequently. In essence, PMA contends that, between the two installments and 14 invoices, it paid Lynx for all of the hours its consultants worked on LTP003, far more than anticipated in the work order. Lynx, quite simply, maintains that it is still owed the third $40,000 installment, and that PMA's failure to pay is a contractual breach. It counters that there was never a modification, and that Lynx was entitled to invoice for Price's fees separately because her work went "above and beyond" the WOA's directive to "begin implementation."

Regardless of the particular permutation, each and all of the disputes anchored in the contract will depend on contract construction for resolution. Under Louisiana law, courts interpret a contract as a matter of law, looking within the instrument's four corners and guided by the state's rules of construction. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." *Kappa Loyal, L.L.C. v. Plaisance Dragline & Dredging Co., Inc.*, 848 So. 2d 765, 769 (La. Ct. App. 2003); *see also* La. Civ. Code Ann. art. 2046. Courts must refrain from construing terms in a manner that leads to absurd consequences or renders a provision superfluous, even if the terms seem explicit. *Texas E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 742 (5th Cir. 1998); La. Civ. Code Ann. art. 2049. Each provision is read "in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code Ann. art. 2050.

Only when a contract remains "'uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction'" may the court examine extrinsic evidence to resolve the ambiguity. *Texas E. Transmission Corp.*, 145 F.3d at 741–42 (quoting *Lloyds of London v. Transcontinental Gas Pipe Line Corp.,* 101 F.3d 425, 429 (5th Cir. 1996)); *see also Semco, LLC v. Grand Ltd.*, 221 So.

3d 1004, 1029 (La. Ct. App. 2017) (quoting *Kappa Loyal, L.L.C.*, 848 So. 2d at 769). Then, "the

agreement shall be construed according to the intent of the parties. Intent is an issue of fact

which is to be inferred from all of the surrounding circumstances." *Kappa Loyal, L.L.C.*, 848 So.

2d at 769. If there remains a dispute of material fact as to the parties' intent, and thus a choice of

reasonable interpretations of the contract, summary judgment is inappropriate. *Hoover Panel*

*Sys., Inc. v. HAT Cont., Inc.*, 819 F. App'x 190, 195 (5th Cir. 2020).

 Turning to the parties' main agreement, attention is drawn to the provision that the work

orders shall set the payment terms and rates. *See L & A Contracting Co. v. Ram Indus. Coatings,*

*Inc.*, 762 So. 2d 1233, 1234 (La. Ct. App. 2000) ("As a general rule of contract law, separate

documents may be incorporated into a contract by attachment or reference thereto."). Fitting the

parts altogether, not unexpectedly, does not yield a model of clarity. Still, looking to the

operative work order, LTP003, the key question is how to interpret the payment terms. The first

page states:

> Timeframe:
> Project start March 2014 for 24 weeks and may be extended if client requests.
> Rate
> Hourly: $125.00 (*Over 40 hours, will convert to weekly rate*)
> Weekly: $5,000.00
> Monthly: $20,000.00

Elcock Tr. at Ex. 4.

 Then, on the next page, the WOA provides the following—the source of the

parties' contention:

> <u>Note:</u> The following is for budgeting purposes only. It does not bind the client to
> any set hours or dollars for this WOA:
> The estimated length of this WOA is 13 weeks beginning March, 2014 to the end
> of the project. The value of this WOA is $120,000. Associated travel will be
> billed separately.
> Payment terms are as follows:
>  i. LYNX requires 1/3 of the estimated total cost ($40,000.00) to be paid

upon executing this WOA. The next 1/3 installment ($40,000.00) is required 45 days after project initiation. Final payment ($40,000.00) is required upon project completion.

The fee agreed to is valid for a period from March 17, 2014 to August 29, 2014, however should the client choose to extend the engagement for a period of up to 24 months, this fee will remain constant at this level unless there is an increase agreed to by the Client directly with PMA.

*Id*.

Plainly, there is some tension between these two sections; in chief, with respect to how long the work order lasts and how the payments relate to hours worked. Louisiana's rules of construction, however, create a clear path forward. Helpfully, the timing and payment terms on the second page are offered "for budgeting purposes only" and "do[] not bind the client." *Id.* And although the WOA mentions both 24 and 13 weeks as its duration, it is clear that the 24-week timeframe is the operative one. While Lynx makes much of the 13-week language, arguing that the third installment was automatically due at 13 weeks, the plain text of the agreement calls this number an "estimate." *Id.* By contrast, the 24-week timeframe is not described as an estimate. The term holding the fee constant "from March 17, 2014 to August 29, 2014" also describes a 24-week stretch. *Id.*

Simple math further proves the point: the WOA's $120,000 estimated value is based on 24 weeks at the $5,000 weekly rate. A 13-week project at that rate would be valued at just $65,000. Additionally, 24 weeks is not a hard cap: the WOA provides that the project may be extended at SUNY Downstate's request, keeping the fee constant for up to 24 months. *Id.* Clearly, then, the work order does not automatically end at 13 weeks—it runs at least 24, so at least through August 2014, with the chance of an extension.[7] This interpretation is the one that

---

[7] While the Court interprets the timing provisions without looking beyond the four corners of the WOA, a glance at other WOAs reveals that the "13 weeks" number appears to be a typographical error left over from the two prior WOAs, LTP001 and LTP002, which both set up 13-week

renders all of the contract's language effective, consistent and unambiguous, and avoids the "absurd consequence" of having two conflicting hard deadlines.

Beyond its dispositive impact on contract construction, this interpretation of the timing language sheds light on the payment terms, showing the $120,000 is not a flat fee, but rather an estimate subject to adjustment based on hours worked. Again, the $120,000 estimated value "does not bind the client to any set hours or dollars for this WOA." *Id.* The only way to read this text, and the installment payment plan, in concert with the rates set on the first page, is that PMA agreed to pay part of Lynx's fees up front but would ultimately reconcile the payments with the consultants' hours. In other words, if Lynx's consultants worked more than 24 weeks at 40 hours, or $5,000, per week, PMA would pay more than $120,000. If they worked less, PMA would pay less. This interpretation also accounts for the language allowing the project's extension at the same rate: Lynx would simply bill $125 hourly, up to 40 hours, for each added week. And, it is supported by the provision requiring consultants to enter their time weekly in PMA's system. This interpretation renders all provisions effective and unambiguous, reading each "in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code Ann. art. 2050.

Contrarily, Lynx argues that it was owed $40,000 immediately upon LTP003's completion regardless of hours worked. The argument does not change the Court's interpretation or create ambiguity. Bluntly, "a contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight." *Texas E. Transmission Corp*, 145 F.3d at 741. Even if there were ambiguity,

---

projects and say so on both pages. *See* Dkt. 38-11 at 1–4. In the nature of a scrivener's error, this vestigial verbiage has no material impact on dispute resolution.

allowing the Court to review extrinsic evidence, Lynx's proffered evidence is unavailing.  Lynx makes the point that later WOAs specifically tie payment to hours worked could be evidence of a meaningful difference.  All that offers is sheer speculation.  Indeed, it is equally consistent with an effort by PMA to clarify potentially confusing language—clarifications that may have helped avoid additional litigation if included in this WOA.  Such sheer speculation cannot defeat summary judgment.

Next, Lynx's claim that Rehmann completed the LTP003 project and triggered PMA's obligation to pay the third installment is unreasonable.  *See* Pl.'s Opp'n Mem. at 22–23.  Rehmann worked for just around five weeks, and the record is inconclusive as to whether she began the report's implementation.  *See, e.g.*, Elcock Tr. at 110:19–23; Mahin Tr. at 192:15–19.  There is no question, however, that she did not work the WOA's contemplated 40 hours weekly for 24 weeks.  Price continued Rehmann's work on LTP003 because "someone had to now implement those changes" recommended in the report, as LTP003 clearly called for in its task to "begin implementation."  *See* Elcock Tr. at 106:14–19, Ex. 4; *see also* Mahin Tr. at 189:7–10 (Price billed under LTP003); Dkt. 37-73 (Price invoices under LTP003).  PMA's discussions with Lynx at the time made clear that Price would be working under the same WOA as Rehmann.  *See, e.g.*, Dkt. 38-16.  Lynx's argument that Price worked only under LTP008 is flatly wrong because that WOA was not signed until seven months after Price started.  *See* Perminter Opp'n Decl. ¶ 35; Pl.'s Opp'n Mem. at 22–23; Elcock Tr. at Ex. 1.  Lynx also cites PMA Chief Operating Officer Kim Murray's statement that Rehmann's hours had "no bearing on the payment of the invoice" for the second installment as evidence that the total payout was unrelated to hours—yet Murray's statement is consistent with a payment plan that allowed Lynx to invoice for fees up front, but that would ultimately require the payments to align with hours

worked. *See* Pl.'s Opp'n Mem. at 24 (quoting Dkt. 38-22).[8]  Moreover, it is to Lynx's benefit

that $120,000 was not a flat fee, as Lynx's continued work on LTP003 earned it tens of

thousands more dollars.

Moving on, PMA argues that the parties modified the contract to permit for regular

invoicing instead of installments, such that Lynx received full payment and cannot now request a

third installment, a contention Lynx disputes.  *See* Def.'s Mem. at 29–31; Pl.'s Opp'n Mem. at

21–23.  Under Louisiana law, written contracts may be modified by orally or by the parties'

conduct, including "through silence, inaction, or implication." *Semco, LLC*, 221 So. 3d at 1029.

"Specifically, written subcontracts can be orally modified to provide for progress

payments." *Pro. Const. Servs., Inc. v. Lee M. Marcello Contractor, Inc.*, 550 So. 2d 968, 971–72

(La. Ct. App. 1989).  This is true even if the contract says modifications must be in writing or

contains an integration clause saying it constitutes the parties' "entire agreement." *Taita Chem.*

*Co., Ltd. v. Westlake Styrene Corp.*, 246 F.3d 377, 387 (5th Cir. 2001); *Driver Pipeline Co. v.*

*Cadeville Gas Storage, LLC*, 150 So. 3d 492, 502 (La. Ct. App. 2014).  "However, one [party]

may not modify the contract terms unilaterally." *Semco, LLC*, 221 So. 3d at 1029.  The party

asserting modification has the burden to prove, by a preponderance of the evidence, that

modification occurred and was mutually consented to.  *See* La. Civ. Code Ann. arts. 1831, 1927;

*Schindler Elevator Corp. v. Long Prop. Holdings, L.L.C.*, 182 So. 3d 233, 241 (La. Ct. App.

---

[8] Indeed, some of Lynx's testimony acknowledges the articulation between hours worked and funds paid.  Mahin testified, "after the 40,000, 40,000, 40,000 were consumed, so after the 120, any additional work on top of that would be billed on a time and material basis."  Mahin Tr. at 187:3–8.  Elcock testified, describing LTP001's similar installment plan, that if the allotted time and funds were up and "[i]f they needed more time, somebody would have to request more time, request more payment and make those requests."  Elcock Tr. at 55:8–11.  While Elcock would not say whether working less time would translate to less payment, that is, of course, the logical extension of his testimony—and consistent with the contract's plain text.  *Id.* at 55:12–15.

2015).  Parol evidence is admissible in determining whether modification occurred, regardless of an integration clause.  *See* La. Civ. Code Ann. art. 1848; *W. Calcasieu Cameron Hosp. v. Marino*, No. 20-CV-1445 (JDC), 2021 WL 849827, at *3 (W.D. La. Mar. 5, 2021).

With a fairly standard ruffle, the parties' agreement says it "may be modified or amended if the Amendment is made in writing and is signed by both parties."  Revised PMA-Lynx Agreement ¶ 19.  It also contains an integration clause, which says the document "contains the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written."  *Id.* ¶ 18.  Regardless, the parties were permitted, under Louisiana law, to modify the contract orally or by their conduct.  PMA has the burden to show that this occurred.  PMA argues that Lynx's conduct in periodically invoicing for Price's fees, and PMA's consistent payment of those invoices, is clear evidence of mutual consent to modify LTP003's payment terms, which helpfully allowed Lynx to receive funds before the project ended.  *See* Def.'s Mem. at 29–30; Edgens Aff. ¶ 116 (stating it she understood that Lynx sought periodic payments to be able to pay Price faster and that, "[a]s PMA's CFO, I agreed to pay Lynx on this basis instead of, not in addition to, installment payments").  Indeed, Lynx began invoicing for Price's fees on July 18, just three days after it claims to have submitted invoice 14-893R for the third $40,000 installment—before Lynx could have expected to receive that installment, and before the project's 24-week term was up.  *See* Dkt. 37-69; Dkt. 37-72 at 2–3.  PMA paid the Price fee invoices starting on July 31.  Dkt. 37-72 at 12.  Lynx then continued to invoice PMA periodically for Price's fees—sending its next batch of five invoices on August 10—and PMA continued to pay those invoices consistently through the end of LTP003 in December 2014.  *See* Edgens Aff. ¶¶ 110–16.  Lynx did not mention invoice 14-893R or claim it was outstanding at any point during the LTP003 project or during the parties' 2016 efforts to

resolve outstanding invoices, claiming it as outstanding only in 2018, four years after LTP003 ended. *See* Mahin Tr. at 55:1–57:14, 74:11–75:9, 199:7–19; Dkts. 37-30, 37-31.

Significantly, in similar circumstances, Louisiana courts have found parties' invoicing and payment practices to establish modification by conduct, particularly when those practices last for the remainder of the parties' relationship without objection. *See, e.g.*, *Horizon Sec. & Vault Complex v. BFI Waste Sys. of N. Am.*, No. 03-CV-1214 (ML), 2003 WL 22872097, at *2 (E.D. La. Dec. 1, 2003) (finding that defendant's payment of "periodically increasing invoices without question or complaint for nine years" showed consent to modification); *Ceco Corp. v. Mid-Gulf Const., Inc.*, 396 So. 2d 474, 478 (La. Ct. App. 1981) (finding that defendant consented to delayed delivery dates and increased costs, as its "failure to object to the invoice escalation charges constituted an acquiescence in those charges"). Here, Lynx's continued submission of, and PMA's continued payment of, periodic invoices constituted "implied confirmation of [a] modification" to "provide for payment as work progressed" instead of in a final installment. *Pro. Const. Servs., Inc.*, 550 So. 2d at 972 (holding contract was modified by parties' acts to provide for advance on lump-sum construction contract payment); *see also Kennedy Marr Offshore Singapore Pte Ltd. v. Techcrane Int'l Inc.*, No. 12-CV-1985 (LMA), 2013 WL 3283343, at *7 (E.D. La. June 27, 2013) (finding oral modification to payment terms); *Big "D" Dirt Servs., Inc. v. Westwood, Inc.,* 653 So. 2d 604, 608 (La. Ct. App. 1995) (parties modified contract term by continued conduct inconsistent with that term); *Bank of Louisiana in New Orleans v. Campbell*, 329 So. 2d 235, 237 (La. Ct. App. 1976) (finding "tacit acceptance of" modification where parties continued to purchase and pay for deliveries despite inconsistencies with original sales agreement); *W.R. Aldrich & Co. v. Spalitta*, 285 So. 2d 835, 836–37 (La. Ct. App. 1973) (holding that defendant impliedly consented to increased contract costs when he

asked for changes in contracted-for work, was advised cost would be greater and made no objection).

Limply, Lynx counters that there was no modification because modifications had to be in writing and Price's work went "above and beyond" that described in LTP003, such that it was owed her fees in addition to, not instead of, a third installment. *See* Pl.'s Opp'n Mem. at 22 (quoting Mahin Tr. at 205:13–206:4). All vigor is drained from plaintiff's argument because, as noted earlier, all contracts can be modified orally or by conduct under Louisiana law. *See Taita Chem. Co., Ltd.*, 246 F.3d at 387. It is true that, around the time of Rehmann's departure, Lynx expressed confusion about whether LTP003 had been completed, but PMA made clear that Price's work fell under LTP003, and Lynx reflected this understanding by billing for her fees under that WOA. *See* Lanius Tr. at Exs. 4–5; Dkt. 38-16; Dkt. 37-72. The plain text of LTP003, negotiated and signed by Lynx, makes clear that Rehmann's report was due after 30 days, making it equally clear from the start that much of the project's 24-week timeframe covered implementation-related tasks beyond the report's creation and presentation. *See* Elcock Tr. at Ex. 4. Plaintiff is, therefore, "presumed to have consented to its contents and to be bound by the provisions of the instrument" as a consequence of signing it. *Dugas v. Modular Quarters, Inc.*, 561 So. 2d 192, 199 (La. Ct. App. 1990). The personnel change did not change the work required on the project or entitle Lynx to bill extra for Price. It also did not change the payment procedures—Lynx did that by choosing to invoice periodically, and PMA agreed. Once that happened, Lynx could not also receive a $40,000 payment for the same work. The Court finds, therefore, there is no genuine dispute of material fact that the parties modified LTP003 to allow for periodic invoicing instead of installments. PMA's obligation to pay $125 per hour for Lynx's work on LTP003 remained unchanged, but the modification altered the timing of that payment.

Alternatively, in any case, even if the parties had not modified the payment terms, Lynx's breach of contract claim would fail because Lynx does not prove any damages—an essential element under Louisiana law. *See Helpful Hound, L.L.C.*, 331 F. Supp. 3d at 602; *Petroleum Commc'ns, Inc. v. Bellsouth Mobility Inc.*, No. 98-CV-780 (SRD), 1998 WL 733740, at *3 (E.D. La. Oct. 16, 1998) ("[T]here is no action for a breach of contract without damages."). Lynx is contractually entitled only to $125 per hour, up to $5,000 for each 40-hour week its consultants worked on LTP003, and makes no claim that PMA underpaid it for those hours. Instead, its damages claim relies upon its faulty argument that the contract required a third $40,000 payout regardless of hours worked, with Price's fees to be paid on top of that. The record, simply, fails to support a claim for damages, as it shows PMA timely paid each 2014 invoice for Price's work on LTP003 at the agreed-upon rate, giving Lynx more revenue than the anticipated $120,000. *Cf. Pizza Hut, Inc. v. Lundy Enterprises, LLC*, No. 11-CV-11 (DCG), 2013 WL 12123949, at *3 (N.D. Tex. June 11, 2013) (holding, under Louisiana law, that party "fail[ed] to raise a fact issue on this claim because they cannot show damages as a result of this breach"); *W & T Offshore, Inc. v. Apache Corp.*, No. 11-CV-2931 (LHR), 2014 WL 198492, at *15–17 (S.D. Tex. Jan. 16, 2014) (applying Louisiana law and holding, in the alternative, that summary judgment is appropriate where "[t]he undisputed record evidence shows that, as a matter of law" defendant's alleged breach "caused no damages to" plaintiff). "In short, plaintiff has failed to prove" a material dispute "not only by a preponderance of evidence, but by any evidence, that it has suffered any monetary damages by virtue of the" claimed breach. *Avis Rent-A-Car Sys., Inc. v. Gulf Shores Leasing Corp.*, 316 F. Supp. 1253, 1260 (E.D. La. 1970), *aff'd*, 441 F.2d 1385 (5th Cir. 1971). As a result, having found PMA has no contractual obligation to pay invoice 14-893R, the Court grants PMA's motion for summary judgment on the invoice and denies Lynx's

cross-motion.

    ii.    <u>Price's Consulting Fees Covered by "Credit"</u>

The parties also cross-move for summary judgment on a related set of invoices for Price's fees, which PMA claims it paid via a "credit" it accrued by overpaying Lynx on LTP003, and which Lynx maintains are unpaid and overdue. *See* Def.'s Mem. at 32–34; Pl.'s Mem at 10–11.[9] This dispute is rooted in the parties' opposing interpretations of LTP003's payment terms. In this regard, though, the Court has already made a critical determination, that is, that LTP003 required PMA to pay Lynx $125 per hour, up to 40 hours per week, throughout the project. Lynx, then, was entitled to installment payments that would, ultimately, have to align with its consultants' hours, whether that led to a greater or lower payout. Shifting from the promises to performance, in February 2015, PMA realized that Lynx's hours on LTP003 did not match the $80,000 in installment payments PMA had made the previous spring. *See* Edgens Aff. ¶¶ 138–40.[10] At that point, the coverage of LTP003 had recently finished, replaced by that of LTP008 in December 2014, which paid Price $144 per hour to continue implementing improvements to the HIM Department. Elcock Tr. at Ex. 1. Looking back at LTP003, PMA recorded that Rehmann had worked 277.25 hours, which translated to $34,646.25 at her $125 hourly rate, yet the $80,000 in installments PMA paid during her tenure was enough to cover 640 hours of work. Dkt. 37-82. This left an overpayment of $45,353.75 on LTP003. *Id.* Because PMA had fully paid Lynx's invoices for Price's time on LTP003, her work did not reduce the overpayment. *Id.*

---

[9] These are invoices 14-2535, 14-2603, 14-2702, 14-2851 and 14-2861.

[10] This realization was prompted by Lynx's January 2015 submission of invoices for Rehmann's fees from the previous spring, which PMA rejected given that it had already paid Lynx's installment invoices. *See* Pl.'s 56.1 Reply ¶ 132; Dkt. 37-82; Edgens Aff. ¶¶ 117–34. Lynx initially sought payment for those Rehmann invoices in this action, but has withdrawn its claim. *See* Perminter Decl. ¶ 62.

To rectify the situation, PMA proposed in an email to Lynx accounting manager Calvin Darden that PMA count Price's next invoices against the overpayment—the so-called "credit." *Id.* Alternatively, PMA proposed that Lynx could send a refund check. *Id.*

Lynx continued to supply Price and neither accepted nor rejected PMA's proposal, but expressed some confusion about the situation later that spring. *See* Perminter Opp'n Decl. ¶ 40; Edgens Aff. ¶ 141; Lanius Tr. at 104:7–19; Dkt. 37-87 at 6 (Lynx business development chief David Elcock emailing PMA's chief financial officer Robin Edgens, in May 2015, "I'm confused as to an over payment on Elizabeth Rehmann"); Elcock Tr. at Ex. 8 (Elcock emailing Lynx chairman Aric Perminter in May 2015, "Did you know that we owed Pitts Mgmt. $45k for over billing on Elizabeth Rehmann. I just found this out today . . . ."); Dkt. 37-92 at 7 (Edgens writing to Perminter in July 2015, "Also remember the Addie Price invoices needs to be reconciled against the LPT2 fixed fee payments of $80,000").

In any event, it is quite clear, PMA proceeded to put the "credit" toward the next five Price invoices under LTP008: invoices 14-2535 ($4,176), 14-2603 ($10,656), 14-2702 ($10,224), 14-2851 ($9,720) and 14-2861 ($9,864). *See* Pl.'s 56.1 Reply ¶¶ 137–41. These invoices totaled $44,640, leaving just a $713.75 gap between PMA's payments and Lynx's hours. Thereafter, PMA continued paying the Price invoices in full, disregarding the small remaining overpayment. *See* Dkt. 37-92 (showing payments resuming with Price's March 2015 fees, on invoice 14-2886); Edgens Aff. ¶ 158.

PMA maintains that it was entitled to apply this credit given the overpayment or, in the alternative, that the parties modified the contract or that Lynx waived its claim to the invoices by continuing to supply Price without objection. *See* Def.'s Mem. at 32–34. Lynx counters that no agreement between the parties allowed for this practice, and that Lynx never consented to any

modification.  *See* Pl.'s Mem at 10–11; Pl.'s Opp'n Mem. at 24–25.

This time, PMA's evidence comes up short.  It fails to establish modification, as there is no evidence Lynx agreed to or was aware of the "credit" when PMA applied it.  Waiver is inapplicable for the same reason.  "An essential element to the claim of waiver is 'an actual intention to relinquish [an existing right], or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished.'"  *U.S. ex rel. Sun Coast Contracting Servs., LLC v. DQSI, LLC*, No. 13-CV-568 (BAJ) (RLB), 2014 WL 7246936, at *4 (M.D. La. Dec. 17, 2014) (quoting *Tate v. Charles Aguillard Ins. & Real Estate, Inc.*, 508 So. 2d 1371, 1374 (La. 1987)).  Although PMA points to Lynx's conduct in continuing to supply Price while the five invoices for her fees went unpaid, this is not "conduct so inconsistent with the intent to enforce the right," since Lynx often did not invoice or receive payment for consultants' time until months later, but always continued to supply those consultants.

There is, however, another available and applicable doctrine in the law of contract: offset, also known as set-off or, under Louisiana law, compensation.  Specifically, Louisiana law provides that "'[c]ompensation takes place by operation of law when two persons owe to each other sums of money or quantities of fungible things identical in kind, and these sums or quantities are liquidated and presently due.  In such a case, compensation extinguishes both obligations to the extent of the lesser amount.'"  *Buck's Run Enterprises, Inc. v. Mapp Const., Inc.*, 808 So. 2d 428, 431–32 (La. Ct. App. 2001) (citing La. Civ. Code Ann. art. 1893).  Indeed, PMA has specifically pleaded this affirmative defense in its answer.  *See* Answer, Dkt. 11, ¶ 30 ("Defendant is entitled to an offset of any overpayments . . . made by defendant to plaintiff under any agreements between plaintiff and defendant.").  In accord with this doctrine, compensation allows two parties to extinguish the debts they owe each other "without the necessity of an actual

disbursement of funds by the parties," *Gulf States Land & Dev., Inc. v. Ouachita Nat. Bank in Monroe*, 705 So. 2d 189, 192 (La. Ct. App. 1997), and "takes place regardless of the sources of the obligations," *Sims v. Hays*, 521 So. 2d 730, 733 (La. Ct. App. 1988) (citing La. Civ. Code Ann. art. 1894).

Taking steps in harmony with this provision of Louisiana law, PMA offset Lynx's invoices for $44,640 in fees under LTP008 against PMA's $45,353.75 overpayment on fees under LTP003. *See* Dkt. 37-82. This offset, PMA claims, "extinguish[ed] both obligations," at which point PMA resumed paying the Price invoices. *See* Edgens Aff. ¶ 158; Dkt. 37-92. But, to be entitled to this offset, PMA must meet the statutory requirements. Analytically, it satisfies the threshold conditions that the "debts be owed between identical parties," and are for money presently due. *See* La. Civ. Code Ann. art. 1893; *In re Celebrity Contractors, Inc.*, 524 B.R. 95, 108 (Bankr. E.D. La. 2014). Although the money Lynx and PMA owed each other pertained to different work orders, LTP003 and LTP008, "[c]ompensation takes place regardless of the sources of the obligations." La. Civ. Code Ann. art. 1894.

Further, "a determination as to the liquidity of a claim is an essential prerequisite to deciding whether" compensation applies. *Hamp's Constr., L.L.C. v. 1031 Canal, L.L.C.*, 2019 WL 959821, at *2 n.3 (La. Ct. App. Feb. 27, 2019). "A debt is liquid when its 'existence is certain and its quantity determined.'" *Cheniere Constr., Inc. v. Hamp's Constr., LLC*, No. 16-CV-16407 (JTM), 2020 WL 3292213, at *2 (E.D. La. June 18, 2020) (quoting *Am. Bank v. Saxena*, 553 So. 2d 836, 844 (La. 1989)); *see also Admin-Media, LLC v. AC of Lafayette, L.L.C.*, 297 So. 3d 44, 50 (La. Ct. App. 2020) (to be liquid, "the existence and amount of the debt must be known or easily ascertainable by calculation according to legal standards"). By this standard, PMA's debt as to the five Price fee invoices is clearly liquid: it is for a sum certain, as recorded

on invoices reflecting the hours worked and payment owed. Neither party claims those invoices contain inaccuracies or other issues. For Lynx's part, however, it denies owing PMA $45,353.75 under LTP003. "[A] contested debt cannot be a liquidated debt unless the party who claims the offset has the proof to show entitlement to offset promptly and summarily." *Leigh of All Trades, L.L.C. v. Non-Flood Prot. Assets Mgmt. Auth.*, 274 So. 3d 64, 70 (La. Ct. App. 2019). Lynx's denial stems from its claim that LTP003 entitled it to $120,000 regardless of hours worked—a claim discussed and rejected above. Under that WOA, while Lynx was entitled to invoice PMA up front for the $80,000 in installments—before Rehmann had worked nearly the 640 hours those installments covered—Lynx's hours on the project would ultimately have to align with its payments. Two months after LTP003 ended, PMA reviewed its records on the project and sent Lynx its calculation that Rehmann had only worked 277.25 hours at $125 per hour, or $34,646.25. Dkt. 37-82. PMA repeated this calculation in an affidavit submitted to the Court. Edgens Aff. ¶ 138. Lynx has not disputed that Rehmann worked for 277.25 hours. This calculation also finds support in the record, which contains invoices covering all but roughly two weeks of Rehmann's time on the job, recording 231.25 hours of work. *See* Dkts. 37-79, 37-83, 37-84, 37-85; Perminter Opp'n Decl. ¶ 62. PMA's uncontroverted calculations of its overpayment, which aligns with the record and the parties' contracts, constitutes sufficient "proof to show entitlement to offset promptly and summarily." *Leigh of All Trades, L.L.C.*, 274 So. 3d at 70; *see also Walker v. State Farm Mut. Auto. Ins. Co.*, 988 So. 2d 901, 904 (La. Ct. App. 2008) (finding parties' debts offset one another) *Arkla, Inc. v. Maddox & May Bros. Casing Serv.*, 671 So. 2d 1220, 1224 (La. Ct. App. 1996) (same). Accordingly, the Court finds both debts were liquid and that PMA was entitled to compensation as a matter of law. Lynx's claim to invoices 14-2535, 14-2603, 14-2702, 14-2851 and 14-2861 is, therefore, denied, and summary

judgment is granted in favor of PMA.[11]

B.    *Expense Invoices Not Paid by Lynx*

Lynx moves for summary judgment on a set of ten unpaid invoices for expenses incurred by consultant Luis Nicot, totaling $19,088.91.  *See* Pl.'s Mem. at 9; Pl.'s Reply at 7–11.  Lynx argues that PMA received, did not pay and—for purposes of its account stated claim—did not object to invoices 15-1263 (for $1,848.97), 15-1265 ($1,595.87),[12] 15-1268 ($2,100.30), 15-1269 ($1,982.26), 15-1270 ($2,026.12), 15-1271 ($1,688.27), 15-1272 ($1,989.10), 15-1274 ($1,670.11), 15-1275 ($2,019.91)[13] and 15-1276 ($2,168.12).  *See id.*; Dkt. 38-12 at 23–33.

---

[11] Lynx's contention that it did not agree to PMA's offset does not change this result.  While parties may contractually agree to compensation, the right to compensation arises by operation of law when the statutory requirements are met.  *See* La. Civ. Code Ann. arts. 1893, 1901.  Louisiana law also provides for judicial compensation, which occurs "when a court decides two parties are mutually indebted to each other and adjusts the amounts owed in fixing the judgment," regardless of whether the parties are entitled to compensation as a matter of law.  *Engolio v. Fuselier*, 2010 WL 2964497, at *6 (La. Ct. App. July 29, 2010) (citing La. Civ. Code Ann. art. 1902).  Here, "even if [defendant] were not entitled to setoff under the law this Court would order judicial compensation to require setoff because [defendant] and [plaintiff] are mutually indebted to each other."  *EOG Res., Inc. v. Chesapeake Energy Corp.*, No. 07-CV-1246 (DEW), 2013 WL 1290121, at *8 (W.D. La. Mar. 28, 2013).  Additionally, Lynx's invocation of the voluntary payment doctrine is inapposite.  Under that doctrine, "when one with full knowledge of the circumstances involved voluntarily pays an amount not actually owed he cannot thereafter claim the payment back."  *Whitehall Oil Co. v. Boagni*, 229 So. 2d 702, 705 (La. 1969).  PMA did owe the $80,000 in installments as up-front payments under LTP003, at a time when it could not have known many hours Lynx would end up working on the project.  A reconciliation was always going to be necessary, though better communication about it could have helped avoid litigation.  Last, Lynx cannot prevail on an account stated claim as to these five invoices given PMA's contemporaneous denial of its payment obligations, just as factual questions over invoice 14-893R's transmission defeat an account stated claim on that invoice.  *See Abbott, Duncan & Wiener v. Ragusa*, 214 A.D.2d 412, 413, 625 N.Y.S.2d 178 (1st Dep't 1995).

[12] Invoice 15-1265 requested payment of $1,595.87.  *See* Dkt. 38-12 at 24.  At some point in 2016, there appears to have been a typographical error, with various documents stating the amount as $1,955.87.  *See, e.g.*, Def.'s Opp'n Mem. at 22; Dkts. 37-6, 40-29, 40-30, 42-2, 42-3, 42-4.  The Court disregards that error as clearly contradictory to the invoice itself.

[13] Invoice 15-1275 is for $2,019.91, an amount consistently recorded in the parties'

PMA recorded these invoices as received on December 17 and 18, 2015. *See* Dkt. 42-4. PMA's previous, consistent response was that it did not pay Lynx because it had not been paid by SUNY Downstate. *See* Dkt. 42-4 at 1 (email from PMA to Lynx stating, in July 2017, "[t]hese have not been reimbursed to you as we have not been paid by the client"); Murray Tr. at 142:5–145:19 (saying the same), 161:2–165:2 (describing PMA's practice of waiting to pay Lynx until it had received payment from SUNY Downstate); Def.'s Am. Interrogatory Response, Dkt. 37-6, at 6–7 (PMA listing these as invoices it owed); Dkt. 40-29 (same, during 2016 reconciliation efforts); Lanius Tr. at Ex. 35 (Edgens saying in a 2016 email to Lynx, "we paid our subcontractors until we just couldn't bear the load anymore" after SUNY rejected expense submissions). Now, having conceded the lack of a contractual provision permitting nonpayment for that reason, *see* Murray Tr. at 145:15–19, PMA instead claims it does not have to pay the invoices because Lynx must first pay its subcontractors before it can request payment from PMA. PMA argues that because Lynx did not pay Nicot's employer, Expeditive, for these expenses—expenses currently the subject of litigation between Expeditive and Lynx—PMA's contractual obligation to "reimburse" Lynx was never triggered. *See* Def.'s Opp'n Mem., Dkt. 43, at 3, 16–18.

Turning to the contract's text, the relevant provision requires PMA to "reimburse Lynx Technology Partners, Inc. for all 'out-of-pocket' travel and living expenses and for all other pre-approved 'out-of-pocket' expenses," and requires "Lynx Technology Partners, Inc. Staff Members [to] follow PMA policies on completing expense reports in a timely (weekly) manner, and providing original receipts and documentation." Revised PMA-Lynx Agreement ¶ 4.

---

communications. *See* Dkt. 38-12 at 32; Dkt. 42-4 at 2; Dkt. 40-29 at 3. It was, however, listed as being for $1,592.03 in one of Lynx's interrogatory responses. *See* Pl.'s Am. First Interrogatory Response, Dkt. 37-8, at 3; Def.'s Opp'n Mem. at 7. Lynx corrected this error in its moving papers, *see* Dkt. 42-2, and the Court accepts the $2,019.91 sum as accurate and notes that it clearly matches the invoice.

PMA's reimbursement payments are due "within sixty days of receipt of expense reports, providing these are in an approved format with the appropriate documentation or according to the Work Order, whichever is sooner." *Id.* PMA argues that Louisiana law requires courts to apply the "generally prevailing meaning" to contractual language and cites the dictionary definition of "reimburse" as "to pay back someone" or "to make restoration or payment of an equivalent to." *See* Def.'s Opp'n Mem. at 17 (first quoting La. Civ. Code Ann. art. 2047; then quoting Reimburse, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/reimburse). This is a helpful start. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 210 (5th Cir. 2007) ("Dictionaries, treatises, and jurisprudence are helpful resources in ascertaining a term's generally prevailing meaning."); *In re Cajun Elec. Power Co-op., Inc.*, 480 F. App'x 289, 294 (5th Cir. 2012) ("'[R]eimburse' . . . is defined as 'to pay back (an equivalent for something taken, lost, or expended)' and 'to make restoration or payment of an equivalent to'" (quoting Webster's Third New International Dictionary 1914 (2002)). Lynx, while not disputing this definition, offers a different position on *who* is getting reimbursed: the individual consultant, here Nicot. *See* Pl.'s Reply Mem. at 9–10; Perminter Reply Decl., Dkt. 42-1, ¶ 12.

Essentially, it seems, the parties dispute whether Lynx's repayment of its subcontractors and their employees is a condition precedent to PMA's obligation to repay Lynx. "Conditions precedent in a contract—more properly called 'suspensive conditions' under the Louisiana Civil Code—are 'terms that suspend . . . a party's obligation until the occurrence of a condition.'" *Acadian Diagnostic Lab'ys, L.L.C. v. Quality Toxicology, L.L.C.*, 965 F.3d 404, 411 (5th Cir. 2020) (quoting *Mumblow v. Monroe Broad., Inc.*, 401 F.3d 616, 621 (5th Cir. 2005)); *see also* La. Civ. Code Ann. art. 1767. Stated more granularly, in this case, PMA's argument is that its obligation to pay Lynx's expense invoices is suspended until Lynx pays its subcontractors. "But

Louisiana law disfavors any finding that terms of a contract are suspensive conditions. The Supreme Court of Louisiana has gone so far as to say that 'contractual provisions are construed . . . *not* to be suspensive conditions whenever possible.'" *Acadian Diagnostic Lab'ys, L.L.C.*, 965 F.3d at 411 (quoting *S. States Masonry, Inc. v. J.A. Jones Constr. Co.*, 507 So. 2d 198, 201 (La. 1987)); *see also Mumblow*, 401 F.3d at 622 ("Louisiana courts do not infer such conditions without very strong proof."); *Hampton v. Hampton, Inc.*, 713 So. 2d 1185, 1190 (La. Ct. App. 1998) ("Courts do not construe stipulations in a contract as suspensive conditions unless the express contract language compels such construction."). Correspondingly, it comes as little surprise that the party seeking to show a contract contains a suspensive condition has the burden of proof. *Id.*

To cut to the quick, PMA has not met that burden. The text does not compel finding a suspensive condition requiring Lynx to pay subcontractors before receiving reimbursement. The "Staff Members," not Lynx as a company, are the ones incurring the "'out-of-pocket' travel and living expenses" eligible for reimbursement. Revised PMA-Lynx Agreement ¶ 4. The contract provides that "expense reimbursement shall be within sixty days of receipt of expense reports," but mentions no requirement that Lynx first repay the individuals or subcontractors submitting those reports. *Id.* Nor is there the requisite "strong evidence of such intent" by the parties to create a suspensive condition. *Mumblow*, 401 F.3d at 623. Lynx's role on the project was not, it argues, a lender whose role was to pay subcontractors before receiving payment from PMA itself—instead, Lynx was a conduit, passing invoices up the chain and payments back down. *See* Perminter Reply Decl. ¶¶ 9–12; Pl.'s 56.1 Reply ¶ 8; Mahin Tr. at 125:6–16. Accordingly, Lynx notes that its subcontract with Expeditive contains a pay-when-paid provision. *See* Perminter Reply Decl. ¶ 10 (citing Lynx-Expeditive Contract at 3). Once subcontractors' employees

incurred expenses and sought reimbursement, Lynx's role was to present the invoice to PMA and, once PMA paid it, remit payment to the subcontractors. *See id.* ¶ 12; Pl.'s 56.1 Reply ¶ 8. Although Lynx often paid Nicot before receiving payment from PMA, it says it did so to speed up the reimbursements and keep Nicot on the job—not because the contract required it or because PMA ever conditioned payment of Lynx's expense invoices on Lynx's payment of subcontractors. *See* Mahin Tr. at 151:6–16. In point of fact, PMA proffers no evidence that it ever required proof of Lynx's payment to subcontractors before paying expense invoices, and did not raise this objection during any of the parties' prior efforts to address outstanding payments.

The WOA covering Nicot's work, LTP010, further supports a finding that PMA's reimbursement obligations are contingent only on the consultants incurring eligible expenses and submitting supporting documentation. Dkt. 38-11 at 30–31. It describes consultants as the parties receiving reimbursement and sets out detailed procedures for them to do so, such as "pay[ing] for all travel expenses using their personal means of payment" and "submit[ting] a PMA expense report with original backup expense documentation." *Id.* Nowhere does it state that PMA's reimbursement of Lynx is conditioned on Lynx's reimbursement of the consultant. *Id.*; *see also* Elcock Tr. at Exs. 1 (PMA Employee Handbook outlining reimbursement policies, describing repayment of consultant), 10 (PMA saying Lynx should submit consultants' expense reports with documentation, without mention of any requirement that Lynx first had to repay the consultant).

Given that the plain text of the parties' contract does not compel a finding that PMA's reimbursement obligations are subject to the claimed suspensive condition, and that "there is no direct evidence that [PMA] intended the obligation to be conditional," *Mumblow*, 401 F.3d at 624, the Court rejects PMA's proposed suspensive condition. Because the parties do not dispute

that Lynx submitted these Nicot invoices to PMA, or that the expenses listed in them are valid

and accurate, the Court finds PMA breached the contract by failing to pay them. Lynx's motion

with respect to these ten invoices is granted.

Lynx is also entitled to prejudgment interest running from the date payment became due.

*See Southern Marine Sales, Inc. v. Matherne*, 915 So. 2d 1042, 1048 (La. Ct. App. 2005) ("The

law is clear that legal interest is recoverable on debts arising *ex contractu* from the time they

become due, unless otherwise stipulated."); *Schiro-Del Bianco Enterprises, Inc. v. NSL, Inc.*, 765

So. 2d 1087, 1092 (La. Ct. App. 2000) (party "is entitled to recover interest on the amounts of its

unpaid invoices from the dates those invoices became due"); La. Civ. Code Ann. art. 2000; *see*

*also Schwartz*, 539 F.3d at 147 (prejudgment interest awarded according to law of state whose

substantive law determined the claim). The contract requires PMA to pay eligible expense

reimbursements within 60 days or according to the WOA, whichever is sooner. Revised PMA-

Lynx Agreement ¶ 4. The applicable WOA provides for monthly payment of expenses, within

30 days of receipt. Dkt. 38-11 at 31. Lynx is therefore entitled to damages and interest as

follows: invoices 15-1269 (for $1,982.26, dated September 5, 2015, with interest running from

October 5), 15-1263 ($1,848.97, dated September 12, 2015, with interest running from October

12), 15-1270 ($2,026.12, dated September 19, 2015, with interest running from October 19), 15-

1271 ($1,688.27, dated September 26, 2015, with interest running from October 26), 15-1265

($1,595.87, dated October 3, 2015, with interest running from November 3), 15-1272 ($1,989.10,

dated October 17, 2015, with interest running from November 17), 15-1274 ($1,670.11, dated

October 31, 2015, with interest running from November 30), 15-1275 ($2,019.91, dated

November 7, 2015, with interest running from December 7), 15-1276 ($2,168.12, dated

November 14, 2015, with interest running from December 14) and 15-1268 ($2,100.30, dated

November 21, 2015, with interest running from December 21). *See* Dkt. 38-12 at 23–33. The interest rate at the relevant time was four percent per annum. *See Judicial Interest Rates*, La. Off. Fin. Inst., http://www.ofi.state.la.us/Legal%20Judicial%20Rate.htm.

C.  *Invoices Allegedly Not Received by PMA*

Next, Lynx moves for summary judgment on three expense invoices PMA claims it did not receive. *See* Pl.'s Mem. at 13; Def.'s Opp'n Mem. at 2–3, 14. Invoice 14-1052 is for $1,891.73 of consultant Pam Hicks's expenses from June 1 to 7, 2014, and is dated June 7, 2014. *See* Pl.'s Am. First Interrogatory Response, Dkt. 37-8, at 4. Invoice 14-2435 is for $1,339.98 and is described as "Expenses November 2014," dated November 30, 2014. *Id*. Invoice 14-2439 is for $10,984.33, labeled "Freeman Expenses Nov 2014," also dated November 30, 2014. *Id*.; *see also* Dkt. 38-12 at 2, 4–5.

The parties' contract clearly provides that PMA is only required to pay expense invoices after PMA's "receipt of expense reports, providing these are in an approved format with the appropriate documentation." Revised PMA-Lynx Agreement ¶ 4. PMA cannot have breached its contractual obligation to pay an expense invoice if it never received that invoice. Lynx has not introduced any transmission emails for these invoices, nor the receipts required as supporting documentation. *See* Dkt. 38-12 at 2, 4–5. Edgens, the contractually designated recipient of all Lynx invoices, avers that PMA did not receive the invoices. *See* Edgens Opp'n Aff., Dkt. 39-2, ¶¶ 9–16; Def.'s Reply 56.1, Dkt. 43-1, ¶ 8. She claims PMA first became aware of Lynx's claim to invoice 14-1052, and first saw the document itself, during litigation. Edgens Opp'n Aff. ¶ 11. She says Lynx listed invoices 14-2435 and 14-2439 as outstanding in March 2015, but that Lynx did not respond when she asked for a copy of them, which she likewise did not see until this litigation. *Id.* ¶¶ 13–16, Ex. 1. Lynx counters that it submitted the invoices and, as evidence,

notes that it listed them on the spreadsheet of open invoices it sent PMA in 2016, and that PMA did not raise any objections at that time.  Perminter Decl., Dkt. 40-18, ¶¶ 22–24.  Now, it is certainly true that the record reflects that Lynx did list these invoices in its 2016 spreadsheets, and that PMA raised objections to other invoices but not those three.  *See* Dkt. 40-29 at 3.  That said, PMA had already told Lynx it did not have invoices 14-2435 and 14-2439.  *See* Edgens Opp'n Aff. at Ex. 1.  As recounted here, these facts are not disputed; neither are they dispositive at summary judgment.

Put more analytically, on this record, there is a genuine dispute of material fact as to whether Lynx transmitted these three expense invoices, as is required for Lynx to establish that PMA breached an obligation to pay them.  Lynx's listing these invoices as outstanding during the parties' 2015 and 2016 discussions is insufficient proof that the invoices themselves—and the requisite supporting receipts—were submitted to PMA, especially given the contemporaneous evidence of PMA saying it did not have two of them.  Accordingly, Lynx is not entitled to summary judgment on these invoices on a breach of contract theory.

The factual disputes as to Lynx's transmission of the invoices and receipts are likewise fatal to its motion on the alternative theory of account stated, as that claim's first element requires Lynx to show "an account was presented."  *IMG Fragrance Brands, LLC*, 679 F. Supp. 2d at 411.  Summary judgment is inappropriate where, as here, the plaintiff did not "establish that any of the invoices were properly" sent, such as by submitting "cover or transmittal letters." *Morrison Cohen Singer & Weinstein, LLP v. Brophy*, 19 A.D.3d 161, 162, 798 N.Y.S.2d 379 (1st Dep't 2005).  As to invoices 14-2435 and 14-2439, PMA's March 2015 email saying it did not have those invoices also bars Lynx from satisfying the remaining elements of the claim: that the account "was accepted as correct" and that the "debtor promised to pay the amount stated."

*IMG Fragrance Brands, LLC*, 679 F. Supp. 2d at 411. "An allegation of a timely objection to the account, whether ultimately meritorious or not, will generally defeat a summary judgment motion on an account stated." *Banker v. Esperanza Health Sys., Ltd.*, No. 05-CV-4115 (DAB) (JCF), 2011 WL 838909, at *4 (S.D.N.Y. Feb. 2, 2011), *report and recommendation adopted*, 2011 WL 867217 (Mar. 10, 2011) (internal citation and quotation marks omitted); *see also The Haskell Co. v. Radiant Energy Corp.*, No. 05-CV-4403 (DLI) (MDG), 2007 WL 2746903, at *12 (E.D.N.Y. Sept. 19, 2007); *Abbott, Duncan & Wiener v. Ragusa*, 214 A.D.2d 412, 413, 625 N.Y.S.2d 178 (1st Dep't 1995) ("There can be no account stated where no account was presented or where any dispute about the account is shown to have existed."). Lynx's summary judgment motion as to invoices 14-1052, 14-2435 and 14-2439 is, therefore, denied. Given that PMA did not seek summary judgment on these invoices, and factual disputes over transmission persist, the claims to them remain open.

### D. Other Disputed Invoices

#### i. Invoice 14-4154

Invoice 14-4154, dated November 6, 2015, is for $31,958.92 for Nicot's October 2015 fees and expenses. Dkt. 37-62. Lynx has withdrawn its claim to the fee portion of the invoice and now seeks summary judgment on only the expenses, totaling $13,718.92. *See* Pl.'s Reply at 10–11, Perminter Opp'n Decl. ¶¶ 47–48; Dkt. 42-2. PMA's main defense is that Lynx already requested payment for the same expenses through different invoices: 14-4106, 15-1272 and 15-1274. Def.'s Mem. at 23–24; Def.'s Opp'n Mem. at 11–12. All four invoices cover Nicot's October 2015 expenses. Invoice 14-4106 requested $1,662.88 for his expenses, all listed as being incurred on October 14. Dkt. 37-38. PMA paid these expenses in November 2015. *See* Dkt. 37-41 at 3 (showing payment of $1,662.88 in Nicot's expenses via check 55440); Edgens

Aff. ¶¶ 28–31. Invoice 15-1272 requested payment of $1,989.10 in Nicot's expenses, dated October 17. Dkt. 38-12 at 30. Invoice 15-1274 requested payment of $1,670.11 in Nicot's expenses from October 24 and 31. *Id.* at 31. As discussed above, PMA has not paid invoices 15-1272 and 15-1274, and Lynx is entitled to summary judgment on them. Of course, Lynx cannot recover twice for the same expenses, so the question is whether they are, in fact, the same.

Lynx argues that there is no overlap between the invoices, pointing to the different totals next to each line item on 14-4154 versus the other three October 2015 Nicot expense invoices. Perminter Decl. ¶¶ 47–48. Indeed, the charges on the four invoices do not line up. Nor do the exact dates. Invoice 14-4154 provides a date of October 28, 2015 for all the expenses, including multiple hotel and travel charges, which Lynx acknowledges cover "[m]ultiple weeks." Mahin Tr. at 181:20–182:15; *see also id.* at 178:8–15 ("At the time that these invoices were generated there was a lot of confusion with Luis [Nicot] in Expeditive. . . ."); Edgens Aff. ¶ 81 (expressing uncertainty about the charges given "limited detail in the invoice"). The invoices' descriptions are unhelpful, providing only general categories such as "lodging reimbursement" and "travel reimbursement." Without receipts in the record, the confusion persists. While it is possible that the invoices do not overlap, it is also possible that they do. Given this genuine dispute of material fact, the Court denies summary judgment as to Lynx's breach of contract claim on invoice 14-4154.[14] PMA's prior objections to the invoice, along with questions regarding its transmission, also defeat Lynx's motion for summary judgment on its account stated claim. *See* Edgens Aff. ¶¶ 78, 82; Dkt. 37-31 at 9; Def.'s Reply 56.1 ¶ 8; *Abbott, Duncan & Wiener*, 214

---

[14] PMA also claims it is not required to reimburse Lynx because Lynx has not paid Expeditive. *See* Def.'s Mem. at 6. This argument, of course, as discussed above, is not supported by the parties' contract.

A.D.2d at 413.  In light of those questions, and because PMA did not seek summary judgment on the expense portion of this invoice, Lynx's claims to it remain open.

ii.   Invoice 14-2112

Lynx also moves for summary judgment on invoice 14-2112.  *See* Pl.'s Mem. at 14.  That invoice lists $8,562.50 in charges for Price's fees, dated November 9, 2014.  *See* Dkt 37-77 at 5; Dkt. 38-12 at 3.  There are multiple versions of the invoice in the record.  One subtracts a partial payment by PMA, leaving an open balance of $2,709.36—the amount Lynx now claims.  *See* Dkt. 38-12 at 3; Perminter Opp'n Decl. ¶ 59; Dkt. 42-2.  The other does not show any partial payment.  Dkt 37-77 at 5.

Boldly, PMA argues that it already paid invoice 14-2112 in full.  *See* Def.'s Opp'n Mem. at 18–19; Edgens Aff. ¶ 114.  In fact, PMA's check 53873 includes a November 14, 2014 payment to Lynx of the full $8,562.50 requested on invoice 14-2112.  *See* Dkt. 37-77 at 7–8. Although Lynx correctly notes that PMA did not object when Lynx requested payment of a $2,889.11 balance on 14-2112 on its 2016 spreadsheet of claimed invoices, PMA had at that point paid the invoice.  *See* Pl.'s Mem. at 14; Dkts. 37-30, 37-31.  Lynx, on the other hand, does not provide any documentation of the partial payment, which it claims to have received on November 9, 2014, the same date as the invoice's submission.  *See* Perminter Opp'n Decl. ¶ 59. Overall, the clear evidence that PMA fully paid invoice 14-2112 precludes Lynx from prevailing on its summary judgment motion for additional funds on this invoice.  Searching the record, the Court holds that this clear evidence entitles PMA to summary judgment as to invoice 14-2112.

iii.   Invoice 14-3103

Lynx moves for summary judgment on invoice 14-3103, for $4,730.69 in expenses incurred by consultant Karen Hobin, dated April 15, 2015.  *See* Pl.'s Mem. at 14; Dkt. 38-12 at

11; Dkt. 42-2.  PMA counters that, after a back-and-forth with Lynx about the supporting documentation, PMA approved and fully paid this invoice in November 2015, via check 55354. Def.'s Opp'n Mem. at 3, 15; Edgens Opp'n Aff. ¶¶ 20–23, Exs. 3–6.  Lynx responds that it instead applied that check to two different invoices, 14-2850 and 14-3289, and that PMA "accepted and ratified" this because it did not object to Lynx listing 14-3103 on its 2016 spreadsheet of open invoices.  *See* Pl.'s Reply at 12; Perminter Reply Decl. ¶¶ 14–15.  However, check 55354 clearly lists payment of 14-3103 in full.  *See* Edgens Opp'n Aff. at Ex. 6.  While the check also covers the invoices Lynx mentions, 14-2850 and 14-3289, those are just two of the 12 payments listed on that check.  Regardless of whether Lynx misapplied the payments in its internal records, the clear evidence of PMA's full payment of invoice 14-3103 bars Lynx's recovery.  Here, too, the Court searches the record and holds that the uncontroverted evidence entitles PMA to summary judgment on invoice 14-3103.

iv.  <u>Invoice 14-3289R</u>

Lynx next seeks summary judgment on invoice 14-3289R, for $9,173.19, dated October 9, 2015.  *See* Pl.'s Mem. at 14; Dkt. 38-12 at 12.  Lynx claims this invoice is "clearly" for Price's fees, though PMA says it cannot tell whether the charges are for her fees or expenses, and Lynx itself has previously labeled it as an expense invoice.  *See* Pl.'s Mem. at 14; Def.'s Opp'n Mem. at 15–16; Pl.'s Am. First Interrogatory Response at 4 (listing it as "03/20/2015 expenses").  The invoice itself is confusing.  The line items are all listed as fees for "consulting services," but the summary line totaling the amount due says "Total Reimbursable Expenses."  Dkt. 38-12 at 12. The invoice does not list any hours worked or multiply those by Price's $144 hourly rate, and the charges are not in multiples of $144.  *Cf., e.g.*, Dkt. 37-91 (Price fee invoice 14-2861 listing hours worked multiplied by $144 rate, with supporting timesheets).

PMA asserts that, if the invoice is for expenses, it lacks the requisite supporting documentation. *See* Def.'s 56.1 Reply ¶ 10 Def.'s Second Interrogatory Response, Dkt. 37-7, at 10. The record does not show any such documentation. Conversely, if the invoice is for fees, PMA claims it paid Lynx for all of Price's fees and this invoice seeks double recovery. *See* Def.'s Opp'n Mem. at 16; Def.'s Second Interrogatory Response at 10. Attempting to divine what the invoice is for, PMA posits that Lynx may have invoiced it for the amount Nearterm, Price's employer, charged Lynx for her March 1 to 14, 2015 services, pointing to a March 20, 2015 fee invoice from Nearterm to Lynx requesting the exact same amount: $9,173.19 for 74.5 hours of Price's work. *See* Def.'s Opp'n Mem. at 15–16; Edgens Opp'n Aff. at Ex. 5.[15] PMA further notes that Lynx already billed PMA for Price's fees for March 1 to 14 on invoice 14-2886, submitted in June and fully paid in July 2015. *See* Def.'s Opp'n Mem. at 15–16; Edgens Aff. ¶ 157; Dkt. 37-92 (showing invoice 14-2886 and PMA's check paying it). This is a plausible theory, though the record is inconclusive. It is clear, however, that four months later, in November 2015, PMA rejected invoice 14-3289R on the day it was transmitted. Edgens emailed Lynx to ask why it was invoicing for Price when "her work ended a long time ago," observing that "[t]he amounts are not typical fee amounts but there are no expenses referenced" and asking why all the dates were listed as March 20, 2015. Edgens Opp'n Aff. ¶¶ 25–30, Exs. 7–8. Given these issues, Edgens said, "[t]his is not an invoice we can issue a payment towards." *Id.* at Ex. 8.

Nor is it an invoice the Court can order PMA to pay, given the various unresolved issues

---

[15] PMA is not, as Lynx claims in its reply, arguing that invoice 14-3289R is a duplicate of 14-3103. *See* Pl.'s Reply at 12. Rather, PMA is simply noting that Lynx submitted the potentially illuminating Nearterm invoice as part of Lynx's documentation supporting 14-3103, an unrelated Lynx-to-PMA invoice.

about what the invoice is charging for and whether those charges were covered by other checks. It is far from clear that PMA's nonpayment of this invoice breached any contractual obligation to pay Price's fees or expenses, and Lynx's account stated claim is vitiated by PMA's quick rejection of the invoice. Further, as PMA notes, if the invoice is for expenses, Lynx failed to submit the required documentation. Accordingly, Lynx's summary judgment motion on invoice 14-3289R is denied. Nor, given the persistence of material factual disputes as to this invoice, is judgment for PMA warranted.

     v.    <u>Invoice 15-1282</u>

The last miscellaneous invoice on which Lynx seeks summary judgment is 15-1282, for $1,599.49 in Loerzel's expenses, dated November 7, 2015. *See* Pl.'s Mem. at 14–15; Dkt. 38-12 at 37. PMA objects that Lynx never submitted supporting documentation, as required by the parties' contract and work orders. *See* Def.'s Opp'n Mem. at 16; Edgens Opp'n Aff. ¶¶ 31–35. Edgens's assistant Sarah Sickler asked Lynx for documentation when she received the invoice in December 2015, but Edgens says PMA never received a reply or the documentation. *See* Edgens Opp'n Aff. ¶¶ 33–34, Ex. 10; Def.'s Reply 56.1 ¶ 11.

Lynx counters that it submitted the documentation, but does not to point to any record evidence of such. Perminter Decl. ¶¶ 30–31. Instead, Lynx says the invoice itself specifies what it is charging for, that all but the lodging and meals charges are for under $29, that its level of detail was consistent with that of other invoices and that PMA's "trivial complaints" do not negate its obligation to pay. *See id.*; Pl.'s Mem. at 14–15. Regardless of the charges, however, the parties' contract clearly conditions PMA's reimbursement obligation on Lynx "providing original receipts and documentation." Revised PMA-Lynx Agreement ¶ 4. And, it is far from clear that Lynx provided such documentation on this invoice. Accordingly, Lynx is not entitled

to summary judgment on invoice 14-1282 under either a breach of contract theory or, given

PMA's timely objection to the invoice, an account stated theory. Because PMA did not seek

summary judgment on this invoice, and Lynx was not obliged to produce the accompanying

documentation on its own motion, the Court declines to grant summary judgment for PMA.

E.      *PMA's Conceded Invoices*

PMA concedes its contractual obligation to pay 13 additional expense invoices on which

Lynx seeks summary judgment: invoices 14-3903 (for $1,030.35, dated June 19, 2015), 14-3904

($1,407.76, dated June 19, 2015), 14-3905 ($1,091.30, dated July 1, 2015), 14-3907 ($1,646.90,

dated July 20, 2015), 14-3908 ($1,436.35, dated July 20, 2015), 14-3909 ($1,707.35, dated July

29, 2015), 14-3910 ($1,517.03, dated July 29, 2015), 14-3996 ($3,698.07, dated August 15,

2015), 15-1267 ($2,137.60, dated October 24, 2015), 15-1277 ($1,795.62, dated October 31,

2015), 15-1278 ($1,921.12, dated November 14, 2015),[16] 15-1279 ($1,705.40, dated November

21, 2015) and 15-1283 ($1,831.75, dated December 5, 2015). *See* Def.'s Opp'n Mem. at 2–3

(listing these invoices as "Not Disputed"); Dkt. 38-12 at 13–15, 17–21, 25, 34–36, 38 (invoices

matching these amounts). The Court holds that PMA is, therefore, obligated to pay Lynx

$22,926.60 on these invoices, plus prejudgment interest running from 30 days after the date of

each invoice at the statutory rate of four percent per annum. *See Judicial Interest Rates*, La. Off.

Fin. Inst., http://www.ofi.state.la.us/Legal%20Judicial%20Rate.htm.

Additionally, PMA admits its obligation to pay expense invoice 14-3906 but disputes the

amount owed. *See* Def.'s Opp'n Mem. at 3 & n.1. The invoice is for $1,491.71 in travel

---

[16] PMA concedes its obligation to pay $1,925.12, *see* Dkt. 42-2, but Lynx is entitled to recover only $1,921.12—the amount actually charged on invoice 15-1278, *see* Dkt. 38-12 at 35. Additionally, the moving papers of Lynx, but not PMA, misstate the amounts due on others of these invoices—some overstated, some understated. *See* Dkt. 42-2. Lynx is entitled to summary judgment only on the correct amounts, as set forth above and as conceded by PMA.

expenses incurred by consultant Brian Loerzel, dated July 1, 2015. *See* Dkt. 38-12 at 16; Dkt. 37-47 at 2, 12 (Lynx resending invoice to PMA and requesting payment in August 2015). PMA contends it owes only $218, since a spreadsheet prepared by Lynx chief executive officer Gina Mahin, introduced at her deposition, listed that amount. *See* Def.'s Opp'n Mem. at 3 n.1; Mahin Tr. at 20:21–21:1, 23:18–24, Ex. 1; *see also* Pl.'s Am. First Interrogatory Response at 5 (listing amount owed as $218.52). Lynx had written that it was owed $218.52 on a spreadsheet sent to PMA during the parties' February 2016 efforts to close out the remaining open invoices. Dkts. 37-30 at 8, 37-31 at 9. PMA does not contend that it has already paid any part of invoice 14-3906, nor that the invoice is inaccurate or otherwise ineligible for payment—instead, it states simply that Lynx's prior requests for only $218.52 create a triable issue as to the amount due. PMA itself, however, has already resolved any questions on this score. In response to Lynx's 2016 spreadsheet requesting $218.52, PMA corrected Lynx and wrote $1,475.21 as the amount "Due per PMA." Dkt. 37-31 at 9. PMA's interrogatory responses reiterate its admission of liability as to that amount. *See* Def.'s Am. Interrogatory Response at 6–7 ("Defendant states that, according to its records, Plaintiff is owed the following amounts in respect of the following invoices . . . 14-3906 - $1,475.21"). There is no record of full or partial payment of the invoice. Accordingly, Lynx now seeks payment of $1,475.21, apparently abandoning its claim to the invoice's marginally higher $1,491.71 total. *See* Pl.'s Reply at 8 n.6; Dkt. 42-2.

Resultingly, the Court finds that PMA's failure to pay invoice 14-3906 is, as PMA does not dispute, a breach of contract. The expenses were incurred, the invoice was submitted and received, PMA has admitted it owes Lynx for the invoice and the parties raise no questions of liability on this motion. Given that Lynx claims damages of $1,475.21—an amount on which PMA conceded liability both contemporaneously and during litigation, and just $16.50 below the

invoice's unpaid total—the Court finds that Lynx is entitled to summary judgment on that amount, plus prejudgment interest running from August 1, 2015 at four percent per annum.

III.    Indemnification

Finally, the parties cross-move for summary judgment on Lynx's indemnification claim, which seeks PMA's payment of the attorney's fees Lynx incurred in defending the Nearterm litigation. *See* Def.'s Mem. at 17–20; Pl.'s Mem. at 15–17; Dkt. 37-26.[17] Nearterm sued Lynx in New York County Supreme Court on July 17, 2017, bringing claims for breach of contract and account stated on six allegedly unpaid invoices related to the SUNY Downstate project, totaling $50,153.03. *See* Pl.'s 56.1 Reply ¶ 21; Dkt. 37-13; Perminter Reply Decl. ¶ 7. Lynx initially defaulted, asserting that Nearterm served it at the wrong address, and Nearterm obtained a default judgment. *See* Pl.'s 56.1 Reply ¶ 31; Mahin Tr. at 226:20–227:3. Once Lynx learned of the action, the parties stipulated to vacate the default judgment and proceeded to an adjudication on the merits. *See* Pl.'s 56.1 Reply ¶ 31; Dkt. 37-22. The court granted summary judgment for Lynx on five of the six disputed invoices, citing clear proof that Lynx had issued Nearterm a check covering them. Dkt. 37-26. As to the sixth invoice, for $13,044.46, the court found the evidence inconclusive—citing Lynx's testimony that it was continuing to investigate whether that invoice was paid—so it denied summary judgment and set a trial date. *Id.* Nearterm discontinued the action before trial. Perminter Opp'n Decl. ¶ 54; Dkt. 37-27. Lynx's attorney's fees totaled $59,355.18. Perminter Decl. ¶ 56; Dkt. 40-31.

Lynx's claim stems from the indemnification clause in its contract with PMA. It is the

---

[17] Lynx withdrew its indemnification claim as to subcontractor Expeditive without prejudice, since that action remains ongoing. *See* Pl.'s Opp'n Mem. at 13 n.7. *See Meloy v. Conoco, Inc.*, 817 F.2d 275, 280 (5th Cir. 1987) ("[A] cause of action for indemnification for cost of defense does not arise until the lawsuit is concluded and defense costs are paid.").

point of departure for claim determination.  Under Louisiana law, "the general rules governing the interpretation of contracts apply in construing indemnity agreements," and "the language in the indemnity agreement dictates the obligations of the parties."  *Hai Nam Chinese Restaurant Partnership v. B & B Const. of New Iberia*, 942 So. 2d 97, 105 (La. Ct. App. 2006).  When assessing the agreement's scope, the key question is one of intent: "[b]ecause the purpose of the indemnity agreement is to allocate risks inherent in the activity between the parties to the contract, [courts] must determine whether the risk that resulted in the injury was one contemplated by the parties to the contract."  *Perkins v. Rubicon, Inc*., 563 So. 2d 258, 259 (La. 1990); *see also Fontenot v. Mesa Petroleum Co*., 791 F.2d 1207, 1214 (5th Cir. 1986).  To determine the parties' intent, courts examine "the plain, ordinary, and popular sense of the language used" and "constru[e] the entirety of the document on a practical, reasonable, and fair basis."  *Naquin v. Louisiana Power & Light Co*., 943 So. 2d 1156, 1161 (La. Ct. App. 2006).  Upon finding a contract's words are unambiguous and lead to no absurd consequences, a court may not continue to search for the parties' intent or examine extrinsic evidence.  La. Civ. Code Ann. art. 2046.

PMA and Lynx agreed to the following indemnification provision:

> Both parties agree to indemnity and hold harmless each other, its officers, employees and agents from and against, any and all liability, loss, damage, claims, demands, cost, judgments, settlements, fees, including reasonable attorney fees and court costs, or loss arising directly or indirectly out of the performance by either party, its officers, employees, and agents of this engagement including but not limited to all actions or omissions taken by either party, its officers, employees or agents pursuant to the Agreement or at the direction or request of either party.

Revised PMA-Lynx Agreement ¶ 22.

PMA first argues that the indemnification clause does not cover Lynx's claim because the agreement does not cover Lynx's negligence or intentional misconduct.  *See* Def.'s Mem. at 17–

20; Def.'s Reply, Dkt. 39, at 3–5. Precisely. A contractual indemnification clause will not be construed to indemnify a party against losses caused by its own fault or negligence unless the text expresses that intention in clear, unequivocal terms. *See Morella v. Board of Com'rs of Port of New Orleans*, 888 So. 2d 321, 328 (La. Ct. App. 2004) (quoting *Perkins*, 563 So.2d at 259). Where a contract uses only general language covering "any and all liability," courts will not read it "to impose an obligation so extraordinary and harsh as to" require indemnification for the indemnitee's negligence. *Ponder v. SDT Waste & Debris Services, L.L.C.*, 2017 WL 3498159, at *3 (La. Ct. App. Aug. 16, 2017). Because the parties' agreement uses just such general language, it will not be read to cover claims arising from Lynx's negligence or intentional fault. That said, the New York court's merits-based determination was that Lynx was *not* at fault—that it fully paid five of the six claimed invoices. As to the sixth, the court never found Lynx breached the contract, it simply was unable to decide the matter on summary judgment. Nearterm then discontinued the action, preventing Lynx from obtaining an adjudication of that claim. In analogous cases where an indemnitee is unable to obtain a merits-based resolution of all claims, courts have found that indemnification remains available. *See Louisiana United Business Association Casualty Insurance Co. v. J & J Maintenance, Inc.*, 328 F. Supp. 3d 563, 573–75 (W.D. La. 2018) (denying indemnification as to claims indemnitee chose to settle but granting it as to claims on which merits-based decision was unavailable for other reasons). PMA's argument that the indemnification clause is inapplicable because it does not cover negligence or intentional misconduct is, therefore, unavailing.

PMA next contends that the indemnification clause does not cover claims arising from Lynx's contractual liability. Whether an indemnification clause covers only tort liability, or whether it extends to contractual claims, varies case by case based on the text and surrounding

circumstances. For example, the Fifth Circuit found that an offshore drilling contract requiring indemnification "for injury or death of persons" covered only claims arising in tort, finding "nothing in the contractual language itself or in the realities of the situation" that showed the provision was intended to cover contract claims. *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 331, 334 (5th Cir. 1981); *see also, e.g.*, *Underwriters at Lloyd's Syndicate 1036 v. Danos & Curole Marine Contractors, L.L.C.*, 149 So. 3d 877, 885 (La. Ct. App. 2014) ("The use of the language 'for personal injury' in the indemnity provision effectively limits indemnity claims to those grounded in tort."). In other cases, indemnification agreements are read to cover contract claims where their text shows "no distinction being made between so-called contractual or so-called tortious liability." *Lirette v. Popich Brothers Water Transport, Inc.*, 699 F.2d 725, 728 (5th Cir. 1983). Moreover, "expansive language such as 'all liability' 'arising out of,' 'in any way connected,' or 'causes of action of whatsoever nature,'" supports a finding that contract claims are covered. *Duet v. Falgout Offshore, LLC*, No. 09-CV-3321 (ECF), 2011 WL 2003405, at *5 (E.D. La. 2011). Overall, though, the provision "'need not contain any special words to evince an intention to create a right of indemnity for independent contractual liabilities'"— instead, "it merely 'must clearly express such a purpose.'" *Hilcorp Energy Company v. JP Oil Company, LLC*, No. 16-CV-598 (RFD), 2017 WL 3528865, at *5 (W.D. La. 2017) (quoting *Sumrall v. Ensco Offshore Co.*, 291 F.3d 316, 320 (5th Cir. 2002)).

In line with these precedents, the Court finds that the indemnification clause in the parties' agreement covers contractual claims. It uses expansive language, including "any and all liability, loss, damage, claims," and the like "arising directly or indirectly out of the performance by either party, its officers, employees, and agents." Revised PMA-Lynx Agreement ¶ 22. *Cf., e.g.*, *Breaux v. Halliburton Energy Services*, 562 F.3d 358, 364 (5th Cir. 2009) (finding coverage

of contract claims where provision covered "*all liability arising out of* all claims"); *Sumrall*, 291 F.3d at 318 n.4, 320 (same, where clause covered "all claims . . . and causes of action of whatsoever nature or character . . . and whether arising out of contract [or] tort"); *Ebanks v. Offshore Liftboats, LLC,* No. 08-cv-1340 (HGB), 2009 WL 3834365, at *5 (E.D. La. Nov. 10, 2009) (contract claims included by clause covering "claims, demands, . . . liabilities . . . of any kind and nature"). The parties' agreement does not contain any language that could be construed as limiting coverage to tort claims. *See, e.g.*, *Hess Corporation v. Schlumberger Technology Corporation*, No. 16-CV-3415 (SL), 2019 WL 5846675, at *30 (S.D. Tex. 2019) (finding coverage of contractual liability where agreement "does not contain the words 'breach of contract,'" but "defines the term 'claims' broadly"); *Broadmoor Anderson v. National Union Fire Ins. Co. of Louisiana*, 912 So. 2d 400, 405–06 (La. Ct. App. 2005) ("[T]he general grant of coverage is not limited to only claims in tort."). Although the provision also does not mention contract claims, it would be an "absurd result" of the sort Louisiana law counsels against to read an expansive indemnification clause in a contract for the provision of professional consulting services—desk jobs, not dangerous industrial work as in many of the contracts covering personal injury—to cover only tort liability. *See* Revised PMA-Lynx Agreement ¶¶ 1, 8, Ex. A (outlining services Lynx and its subcontractors are to provide under the agreement).

Having found the indemnification provision covers contractual liability, and that it does not cover liability due to a party's negligence or fault, the question becomes whether Lynx's current claim fits the bill. This claim is indeed one for "reasonable attorney fees . . . arising directly or indirectly out of the performance" of Lynx. Revised PMA-Lynx Agreement ¶ 22. The agreement covers liability "including *but not limited to*" actions taken at either party's direction. *Id.* (emphasis added). While PMA argues that it did not direct Lynx to fail to pay

49

Nearterm, and Lynx counters that PMA did direct it to hire Nearterm, those arguments miss the mark. *See* Def.'s Opp'n Mem. at 13; Pl.'s Reply at 14–15. The question is whether the Nearterm litigation arose out of Lynx's performance of the contract with PMA. "The Louisiana Supreme Court has held such 'arising out of' language requires 'a connexity similar to that required for determining cause-in-fact: Would the particular injury have occurred but for the performance of work under the contract?'" *Louisiana United Business Association Casualty Insurance Co.*, 328 F. Supp. 3d at 570 (quoting *Perkins*, 563 So. 2d at 259).

Plainly, Lynx's hiring of Nearterm, and the subsequent payment dispute, would not have occurred but for Lynx's performance of the contract with PMA. That contract contains a list of professional services to be performed by "[d]esignated Staff Members employed or contracted by Lynx Technology Partners, Inc." Revised PMA-Lynx Agreement ¶ 1, Ex. A. The agreement elsewhere contemplates that Lynx will hire subcontractors to "perform services for PMA under this Agreement." *Id.* ¶ 8. It is beyond genuine dispute, therefore, that the Nearterm litigation arose out of Lynx's performance, Lynx was not found to be at fault and its claim for attorney's fees from that contractual dispute falls within the scope of the indemnification clause.

Having found Lynx is entitled to indemnification, a determination of reasonable attorney's fees, computed with reference to the prevailing rate in New York County Supreme Court, where the case was litigated, is respectfully referred to Magistrate Judge Peggy Kuo for a report and recommendation.

## Conclusion

For the foregoing reasons, the parties' cross-motions for summary judgment are granted in part and denied in part. Lynx is entitled to summary judgment on its indemnification claim as to its defense of the Nearterm litigation, but a determination of reasonable fees is respectfully

referred to Magistrate Judge Peggy Kuo for a report and recommendation. Judgment is granted

on the disputed invoices as stated above and set forth in the following chart:

| Invoice No. | Party Prevailing on Summary Judgment | Invoice Amount | Prejudgment Interest Start Date[18] |
|---|---|---|---|
| 14-2112 | PMA | $8,562.50 | N/A |
| 14-2535 | PMA | $4,176.00 | N/A |
| 14-2603 | PMA | $10,656.00 | N/A |
| 14-2702 | PMA | $10,224.00 | N/A |
| 14-2851 | PMA | $9,720.00 | N/A |
| 14-2861 | PMA | $9,864.00 | N/A |
| 14-3103 | PMA | $4,730.69 | N/A |
| 14-893R | PMA | $40,000.00 | N/A |
| 14-1052 | Neither | $1,891.73 | N/A |
| 14-2435 | Neither | $1,339.98 | N/A |
| 14-2439 | Neither | $10,984.33 | N/A |
| 14-3289R | Neither | $9,173.19 | N/A |
| 14-4154 | Neither | $13,718.92 (Expenses only) | N/A |
| 15-1282 | Neither | $1,599.49 | N/A |
| 14-3903 | Lynx | $1,030.35 | July 19, 2015 |
| 14-3904 | Lynx | $1,407.76 | July 19, 2015 |
| 14-3905 | Lynx | $1,091.30 | August 1, 2015 |
| 14-3906 | Lynx | $1,475.21 | August 1, 2015 |
| 14-3907 | Lynx | $1,646.90 | August 20, 2015 |
| 14-3908 | Lynx | $1,436.35 | August 20, 2015 |
| 14-3909 | Lynx | $1,707.35 | August 29, 2015 |
| 14-3910 | Lynx | $1,517.03 | August 29, 2015 |

---

[18] As noted above, prejudgment interest, where awarded, is at four percent per annum. *See Judicial Interest Rates*, La. Off. Fin. Inst., http://www.ofi.state.la.us/Legal%20Judicial%20Rate.htm.

| Invoice No. | Party Prevailing on Summary Judgment | Invoice Amount | Prejudgment Interest Start Date[18] |
|---|---|---|---|
| 14-3996 | Lynx | $3,698.07 | September 15, 2015 |
| 15-1263 | Lynx | $1,848.97 | October 12, 2015 |
| 15-1265 | Lynx | $1,595.87 | November 3, 2015 |
| 15-1267 | Lynx | $2,137.60 | November 24, 2015 |
| 15-1268 | Lynx | $2,100.30 | December 21, 2015 |
| 15-1269 | Lynx | $1,982.26 | October 5, 2015 |
| 15-1270 | Lynx | $2,026.12 | October 19, 2015 |
| 15-1271 | Lynx | $1,688.27 | October 26, 2015 |
| 15-1272 | Lynx | $1,989.10 | November 17, 2015 |
| 15-1274 | Lynx | $1,670.11 | November 30, 2015 |
| 15-1275 | Lynx | $2,019.91 | December 7, 2015 |
| 15-1276 | Lynx | $2,168.12 | December 14, 2015 |
| 15-1277 | Lynx | $1,795.62 | November 30, 2015 |
| 15-1278 | Lynx | $1,921.12 | December 14, 2015 |
| 15-1279 | Lynx | $1,705.40 | December 21, 2015 |
| 15-1283 | Lynx | $1,831.75 | January 5, 2016 |

So Ordered.

Dated:   Brooklyn, New York
         June 6, 2021

/s/ Eric N. Vitaliano

ERIC N. VITALIANO
United States District Judge